*492 OPINION OF THE COURT
Bellacosa, J.
Plaintiff Pearce, Urstadt, Mayer & Greer Realty Corp. (PUMG) procured a construction loan commitment for defendant Atrium Development Associates (Atrium) and now sues to recover its claimed brokerage commission. PUMG argues that Atrium’s abandonment of the entire development project and consequent failure to close on the loan commitment because it did not need the proceeds constituted a "willful default” within the meaning of the brokerage agreement between them and that this triggered PUMG’s entitlement to its quarter of a million dollar commission. We hold that PUMG should not have been granted summary judgment because issues of fact exist which require a trial. Thus, the order of the Appellate Division should be reversed.
Atrium is a Virginia partnership which was formed in 1983 to purchase a nine-acre parcel of vacant land in Henrico County, Virginia, and to construct a five-story office and retail building on the site. PUMG was retained to arrange financing for the project. Atrium purchased the parcel in 1983 for $1.5 million and the construction cost of the project was originally estimated at $11.5 million.
On April 24, 1984, the parties executed a loan brokerage agreement which authorized PUMG to negotiate a $15 million loan commitment to Atrium from Carteret Savings and Loan Association, F.A. (Carteret). Paragraph 1 of the agreement provided that PUMG waived its claim to any commission if "such commitment fails to be executed by all parties and *493 delivered, or if such commitment is executed and delivered and the initial disbursement thereunder fails actually to be delivered, received and accepted in accordance with the terms of such commitment for any reason whatsoever, except the willful default of Atrium” (emphasis added). In paragraph 2, PUMG agreed to the \Vi% commission ($225,000) "[i]f and only in the event that the Loan closes and the initial disbursement thereunder is actually delivered, received and accepted in accordance with the terms of such commitment”. On October 2, 1984, PUMG and Atrium confirmed their brokerage agreement in a second document which repeated and continued these provisions.
By letter dated July 19, 1984, Carteret issued its conditional commitment to lend $13.5 million to Atrium. Atrium accepted the commitment on August 21, 1984 and forwarded a deposit check in the amount of $150,000 to Carteret. The commitment letter was amended on September 12, 1984 to increase the construction loan amount to $14.25 million and to require that the over-all construction budget be under $15.75 million; otherwise, Carteret reserved the right to require additional security.
Revised estimates of the cost of the construction project revealed that the project could not be built within budget and Atrium decided, apparently for business and finance reasons, to abandon it entirely. The need for financing having evaporated, Atrium did not close on the Carteret loan commitment, forfeited the $150,000 deposit, and refused to pay PUMG a brokerage commission. This lawsuit followed.
PUMG emphasizes as the pivotal allegation that Atrium "willfully defaulted” under the terms of the brokerage agreement. The trial court’s grant of summary judgment to PUMG sprang from its acceptance of that approach and a conclusion that Atrium’s decision not to proceed with the project was a voluntary act, constituting a "willful default” within the meaning of the brokerage agreement. The Appellate Division affirmed and this Court granted leave to appeal. Our reversal and denial of summary judgment are premised on discernible issues of fact regarding the import and effect of key, interrelated provisions and terminology in this brokerage agreement.
PUMG contends that it earned its commission as soon as it did what Atrium retained it to do: procure a loan commitment which Atrium accepted. An initial hitch, as PUMG concedes, is that the brokerage agreement does not state that PUMG’s *494 commission would be earned simply upon execution, delivery and acceptance of a loan commitment (compare, Midland Mortgagee Corp. v Kazarnovsky, 128 AD2d 595).
On the contrary, the brokerage agreement can be interpreted as imposing certain conditions on PUMG’s entitlement to a commission, even after execution and acceptance of the commitment. Paragraph 2 of the brokerage agreement — containing all the brokerage commission terms — provides in specific and restrictive language that PUMG will "accept” its commission '[i]f and only in the event that the Loan closes and the initial disbursement thereunder” is made (emphasis added). This language suggests that PUMG’s entitlement to its commission was conditioned on closing the loan and making an initial disbursement — events which did not occur here.
PUMG counters that the language in paragraph 2 merely states when its commission is payable, and that paragraph 1 of the brokerage agreement — which on its face purports to deal only with waiver of, not entitlement to, the commission— fixes its entitlement to a commission. Thus, PUMG argues that its commission was earned and must be paid because it procured a commitment which Atrium accepted but "the initial disbursement under the commitment [was] not delivered, received or accepted” due to Atrium’s "willful default”. PUMG’s argument, however, highlights the ambiguity of the language in the two key paragraphs of the agreement under analysis. Even assuming Atrium’s actions could be deemed a "willful default” within the meaning and usage of that clause in paragraph 1, the loan did not close and the terms of the commission referred to in paragraph 2, which was keyed to the closing of the loan, were not triggered with the kind of certainty and clarity necessary to support a grant of summary judgment. To enjoy that substantial procedural advantage and remedy, the sophisticated parties here, both of them, could surely have specified the timing sequences and events applicable to the earning and the payment of PUMG’s commission more plainly and certainly. Taken in its entirety with its related yet unsynchronized provisions, this brokerage agreement does not unambiguously resolve the lawsuit and the question, within a summary judgment framework, of when PUMG would earn its commission.
Further assuming, as did the lower courts, that the closing of the loan was not a condition of PUMG’s entitlement to an earned commission, we cannot jump to the further conclusion *495 on this record that Atrium’s actions constituted a willful "default” as a matter of law and as that term is used in this brokerage agreement. In Graff v Billet (64 NY2d 899), we construed a similar key phrase in a lawsuit to recover a commission under an agreement which provided that the real estate broker’s commission from the seller was due and payable when title passed, except for willful default. We held that the seller’s refusal to enter into a sales contract with a prospective buyer produced by the real estate broker was not a default within the meaning of the commission agreement because the agreement did not legally commit the seller to enter into a sales contract.
Atrium argues, paralleling the Graff rationale, that as a matter of law prospective borrowers — in this case, Atrium— cannot be charged with "defaulting” from loan "commitments” that do not obligate them to borrow and are unilateral in their juridical nature and effect until a loan closing occurs. Atrium contends that the willful default provision in its brokerage agreement with PUMG, by its usual commercial sense and intendment, applied only in the event the loan commitment PUMG eventually obtained for Atrium obligated Atrium to proceed with the loan. The loan commitment from Carteret did not; therefore, "default” from a nonexistent legal obligation in this context is an alien notion.
We are thus presented here with a seemingly a fortiori application of the principle of Graff with respect to a distinct commercial transaction. However, we emphasize that our ruling and rationale in favor of appellant Atrium does not adopt its broad argument in the abstract. That approach could render properly and plainly used willful default provisions essentially meaningless and write them out of negotiated contracts. This courts should not do. It is important to note that we are not doing that in the context of this case because the inoperability of the default clause here — at least as a matter of law in favor of PUMG — flows from the unusual combination of terms the parties used in the two key provisions of their negotiated agreement. In order for the word "default” to carry meaning and consequences as a commercial transaction term of art, greater clarity reflecting the intent of the contracting parties is required. The significant procedural advantage sought and achieved in the lower courts in this case — summary judgment — was not earned under the terms of this agreement.
*496 Accordingly, the order of the Appellate Division should be reversed, with costs, and plaintiff’s motion for summary judgment denied.