MDC CORPORATION, INC.
and Artistic Greetings,
Inc., Plaintiffs,

v.

JOHN H. HARLAND COMPANY,
Defendant.

No. 01 Civ. 5918(MBM).

United States District Court,
S.D. New York.

Sept. 30, 2002.

---

388

David A. Piedra, Morrison, Cohen, Singer & Weinstein, New York City, Mark D. Wegener, Edward Han, Nancy Tunis, Howrey, Simon, Arnold & White, Washington, D.C., for Plaintiffs.

Richard A. Cirillo, Corina N. Stonebanks, Lisa B. D'Alessio, King & Spalding, New York City, for Defendant.

## OPINION AND ORDER

MUKASEY, Chief Judge.

In this diversity action, plaintiffs Artistic Greetings, Inc. ("Artistic") and MDC Corporation, Inc. ("MDC") sue John H. Harland Company ("Harland"), seeking a judgment declaring that a covenant not to compete in an agreement between Harland and Artistic is enforceable against Artistic only and unenforceable against MDC or any other party. Harland counterclaims, alleging breach of contract against Artistic and tortious interference with a contract against MDC.[1] Artistic and MDC move to dismiss the counterclaims pursuant to Fed. R.Civ.P. 12(b)(6). For the reasons stated below, the motion is denied.

### I.

The following facts are alleged in the complaint and the amended answer and counterclaims ("Counterclaims"); the facts taken from the counterclaims are accepted as true for the purposes of this motion. Harland sells checks and other financial forms to financial institutions. Harland is a Georgia corporation and maintains its principal place of business in Decatur, Georgia. (Compl.¶ 7) Artistic sells checks directly to consumers. Artistic is a Delaware corporation and maintains its principal place of business in Joppa, Maryland. (*Id.* ¶ 6) MDC, through its divisions and subsidiaries, prints and sells checks, postage stamps, credit cards, and transaction services. MDC is organized under the laws of Ontario, Canada and maintains its principal place of business in Toronto, Canada. (*Id.* ¶ 5)

Harland and Artistic entered into three written agreements on or about August 29, 1996 ("the Agreements")—a Master Agreement, a Fulfillment Agreement, and an Agreement to Purchase Equipment ("Equipment Agreement"). (Counterclaims ¶ 31) Under the Fulfillment Agreement, Artistic agreed to purchase its requirements of checks from Harland during the term of the Agreements and Harland agreed to supply Artistic's check requirements for direct sale to consumers. (*Id.* ¶ 32; Master Agreement § 3.3)

Section 8.2 of the Master Agreement bars Harland from competing with Artistic in the direct mail market. (Counterclaims ¶ 34) Section 8.2(a) provides that:

> neither [Harland] nor any of its Affiliates shall engage, directly or indirectly, on its own account, or as a shareholder, agent, officer, director, partner or joint venturer in any corporation or business entity, in any business engaged in the direct mail marketing of checks and/or

---

1. Harland also claims that it is entitled to recover from Artistic the costs and expenses of investigating and defending Artistic's and MDC's claims and pursuing its counterclaims. Because Artistic's and MDC's motion to dismiss does not address this claim, it will not be considered here.

direct mail sale of checks from, at or into the United States (a "Competing Business"), nor within the same area to lend money or otherwise furnish services to any Competing Business ....

(Master Agreement § 8.2(a)) Section 8.2(b) restricts Harland from entering the consumer check business by giving Artistic the right to buy any competing business acquired by Harland within 15 days of the acquisition. (Master Agreement § 8.2(b)) Section 8.2(c), in addition to granting Artistic an option to buy Harland's interest in The Check Store, Inc. ("CSI") for any price that a third party might offer Harland, also permits Harland to maintain its ownership interest in CSI provided that CSI:

> place only such advertising as shall have been committed prior to the date of this Agreement, which in any event shall not exceed $500,000, any other advertising of any kind by CSI shall be prohibited and [Harland] will use its reasonable best efforts to cause CSI to cancel and/or terminate any committed advertising which can be terminated without penalty; and to not expand its business in any way beyond the servicing of initial orders and reorders ....

(Master Agreement § 8.2(c))

In addition to placing restrictions on Harland, Section 8.2(a) also identifies certain Harland businesses that the Master Agreement does not cover:

> Notwithstanding the foregoing, nothing in this Agreement shall restrict the right of [Harland] to continue to conduct its business as presently conducted which involves relationships with (a) catalog companies which place, and/or distribute catalogs containing, ads for distinctive, premium priced checks which are produced and designed by [Harland], (b) large affinity groups which sell ad space in their publications in which [Harland] advertises such affinity

group's specialty checks, (c) third party marketing groups which promote distinctive, premium priced checks and whereby [Harland] provides entry, printing and customer service for such groups, (d) financial software companies where [Harland] provides private label order fulfillment and direct mail campaigns to those companies' customers and (e) direct mail companies where [Harland] provides order fulfillment and/or provides supplies.

(Master Agreement § 8.2(a))

Artistic and Harland also included the following "Covenant not to Compete" in Section 8.2 of the Master Agreement, which restricts Artistic's ability to enter supply relationships with banks:

> For the period from the Closing Date to eighteen (18) months following the termination of the Fulfillment Agreement, [Artistic] agrees that, without the consent of [Harland], neither [Artistic] not any of its affiliates shall engage, directly or indirectly, on its own account, or as a shareholder, agent, officer, director, partner or joint venturer in any corporation or business entity, in any business engaged in the entering into of direct contractual relationships with banking institutions ... to supply check products to customers of such banking institutions in the United States ....

(Master Agreement § 8.2(d))

Pursuant to agreements dated December 21, 1997, MDC, through its subsidiaries, acquired Artistic. (Compl. ¶ 15) At the time of the acquisition, MDC knew of Artistic's obligations under the three agreements, and it accepted and adopted the Agreements when and after it acquired Artistic. (Counterclaims ¶ 45) Although Harland and Artistic initially expected Artistic's check requirements to increase substantially during the term of the agreements (Counterclaims ¶ 33), Artistic did

not increase its purchases from Harland, (*id.* ¶ 39). Instead, at the behest of MDC (*id.* ¶ 46), Artistic diverted its check sales to other affiliates of MDC and dramatically reduced its check product purchases from Harland, (*id.* ¶ 39). Additionally, at the behest of MDC (*id.* ¶ 46), Artistic decreased the frequency of advertising for its check products in favor of increased advertising for the check products of affiliates. (*Id.* ¶ 40) As a result, Harland has not recouped the cost of equipment purchased from Artistic. (*Id.* ¶ 39)

Upon learning of MDC's planned acquisition of Artistic in 1997, Harland gave notice to MDC of an alleged anticipatory breach of the Agreements. (Compl.¶ 19) Harland informed MDC that Harland would consider any agreement by MDC or any of its subsidiaries or divisions to supply checks to U.S. banking institutions to be a "clear violation" of the covenant not to compete and that Harland would seek to enjoin performance under any such agreement. (*Id.*)

Artistic and MDC filed the initial complaint in this action on June 28, 2001. The complaint seeks a declaration that the covenant not to compete in § 8.2(d) of the Master Agreement is enforceable only against Artistic, an injunction barring any attempt by Harland to enforce § 8.2(d) of the Master Agreement against any person other than Artistic, and MDC's and Artistic's costs and reasonable attorney's fees. Harland counterclaims, alleging breach of contract against Artistic on two grounds: breach of the implied obligation to use best efforts in an exclusive dealing contract and breach of the implied covenant of good faith in a requirements contract. Harland also alleges that MDC tortiously interfered with its contract with Artistic. Artistic and MDC now move, pursuant to Fed. R.Civ.P. 12(b)(6), to dismiss Harland's counterclaims on the ground that they fail to state a claim upon which relief can be granted. The parties agree that New York law controls (*see* Master Agreement § 10.7) [2] and that this court has personal jurisdiction over the parties (*see* Master Agreement § 10.7; Counterclaims ¶ 10).

## II.

A motion to dismiss under Rule 12(b)(6) may be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The court must take the facts alleged in the complaint or counterclaim as true and draw all reasonable inferences in favor of the nonmoving party. *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 699–700 (2d Cir.1994).

Although a court generally may not look beyond the pleadings when reviewing a motion to dismiss, Fed.R.Civ.P. 10(c) authorizes the court to consider any exhibits mentioned in and attached to the pleadings. *See* Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir.1985). Here, Harland has attached copies of the Master Agreement and the Fulfillment Agreement to its amended counterclaims as exhibits. These exhibits will be treated as part of Harland's pleadings for the purposes of this motion.

---

2. The parties' briefs also assume that New York law controls. Even without the clause in the Master Agreement, such "implied consent ... is sufficient to establish choice of law." *Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 242 (2d Cir.1989).

### III.

■ Harland first alleges· that Artistic breached the Agreements by violating the covenant of best efforts that is implied at law in an exclusive dealing contract. New York's version of the Uniform Commercial Code ("U.C.C.") governs ·contracts for the sale of goods. *Canusa Corp. v. A & R Lobosco, Inc.,* 986 F.Supp. 723, 727 (E.D.N.Y.1997). Under the U.C.C., "[a] lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." N.Y. U.C.C. § 2–306(2) (McKinney 2001). On its face, this provision could be interpreted to mean that any party to a requirements contract has an implied obligation to use best efforts, because a requirements contract obligates the buyer to buy exclusively from a particular supplier. ,*See* 1 W. Hawkland, *UCC Series* § 2–306:3 (2001) ("By their very nature, output and requirements contracts involve exclusive dealing."). However, an Official Comment to section 2–306 indicates that the duty to ·use best ·efforts applies only to buyers who receive the benefit of an exclusive commitment from a supplier, and not to buyers that merely commit to purchase from a single seller. *See* N.Y. U.C.C. § 2–306, cmt. 5 ("Under such contracts the *exclusive agent* is required, although no express commitment has been made, to use reasonable effort and due diligence in the expansion of the market or the promotion of the product, as the case may be.") (emphasis added).

The relatively sparse case law interpreting section 2–306(2) of the U.C.C. supports the conclusion that the duty to use best efforts applies to exclusive agents only, and not to all requirements buyers. *See Tigg Corp. v. Dow Corning Corp.,* 962 F.2d 1119, 1125 (3d Cir.1992); *Gestetner Corp. v. Case Equip. Co.,* 815 F.2d 806, 811 (1st Cir.1987); *Kubik v. J. & R. Foods of Or., Inc.,* 282 Or. 179, 183, 577 P.2d 518, 520 (1978). In distinguishing between pure requirements contracts and exclusive agency agreements under section 2–306(2), courts have reasoned that when a requirements contract does not obligate the supplier to sell particular goods to one customer alone, the buyer's efforts (or lack thereof) do not necessarily affect the supplier. If the buyer reduces its requirements, the supplier can solicit orders from other buyers. *See Tigg,* 962 F.2d at 1125. On the other hand, in an exclusive dealing arrangement, when the supplier has only one customer in a designated market, that customer's requirements represent all of the supplier's sales in that market. *See id.*

Artistic contends that Harland's best efforts claim should be dismissed based on Section 8.2 of the Master Agreement. Section 8.2(a) prevents Harland from engaging in the direct mail marketing or sale of checks in the United States. (*See* Master Agreement § 8.2(a)) Section 8.2(b) restricts Harland from entering the consumer check business by acquisition, and Section 8.2(c) imposes strict limits on Harland's subsidiary CSI's advertising and marketing to consumers. (*See id.* §§ 8.2–8.3) At the same time, as Section 8.2(a) makes explicit, Harland may maintain supply relationships with catalog companies that market premium checks, "large affinity groups" to which Harland sells specialty checks, "third party marketing groups" to which Harland provides entry, printing, and customer service, "financial software companies where [Harland] provides private label order fulfillment and direct mail campaigns to those companies' customers," and "direct mail companies where [Harland] provides order fulfillment and/or provides supplies." (*See id.* § 8.2(a))

According to Artistic, because Section 8.2(a) permits Harland to maintain these discrete supply relationships, Artistic is not Harland's exclusive agent and therefore has no implied obligation to use best efforts in promoting Harland's products. Harland, however, contends that Section 8.2, with its severe restrictions on Harland's direct marketing and sales of checks, has made Artistic Harland's exclusive sales outlet to check customers in the direct channel of distribution. (Amended Answer ¶ 35)

To grant Artistic's motion to dismiss, this court would have to conclude that, as a matter of law, a requirements contract that allows a supplier to sell goods to any party other than the designated buyer is not an exclusive dealing contract for the purposes of N.Y. U.C.C. § 2–306(2). That is different from holding that an exclusive dealing contract does not exist where a manufacturer maintains the right to sell products generally to other customers after meeting a particular customer's requirements. *See Logan Co. v. BRT Corp.*, No. 91–851, 1992 WL 296708, at *2 (E.D.Pa. Oct.6, 1992) (refusing to infer a "best efforts" obligation where a manufacturer could sell scanners to other customers after selling 50 scanners to a single buyer). Here, pursuant to Section 8.2 of the Master Agreement, Harland has agreed to forego competition in a specified market. Without any additional evidence as to the commercial impact of this provision, to grant Artistic's motion to dismiss would be to conclude that the contract creates no "exclusive dealing" arrangement between Harland and Artistic no matter how much the restrictions on Harland's direct sales affect its business, and despite the preclusion of Harland from competing in the direct mail market.

New York pre-Code law, as well as cases from other jurisdictions interpreting section 2–306(2), counsel against such a brittle interpretation of "exclusive dealing." In *Wood v. Lucy, Lady Duff–Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917) (Cardozo, J.),[3] a sales agent sued his principal for breach of contract, claiming that the principal violated his exclusive right to place the principal's endorsements on the designs of others. The principal defended on the ground that there was no consideration for her promise of exclusivity because the agent had made no express commitment to market the designs. Rejecting the principal's argument, the Court found that the principal's promise was supported by consideration, because the agent had promised implicitly to use reasonable efforts to market the principal's endorsements. To reach this conclusion, the Court did not simply focus on the exclusive privilege granted to

---

**3.** It is widely recognized that section 2–306(2) of the U.C.C. codified the New York Court of Appeals's holding in Wood. *See* N.Y. U.C.C. § 2–306 annots. (McKinney 2002) ("Subsection (2) is apparently based on *Wood v. Lucy, Lady Duff–Gordon.*"); *Tigg*, 962 F.2d at 1125 (treating the statutory provision and the holding in *Wood* as equivalent); *Fusion, Inc. v. Neb. Aluminum Castings*, No. 95–2366, 1997 WL 51227, at *19 (D.Kan. Jan. 23, 1997) (describing section 2–306(2) as a codification of *Wood's* implied covenant to use best efforts); *Flight Concepts Ltd. v. Boeing Co.*, 819 F.Supp. 1535, 1552 (D.Kan.1993) (treating the statutory provision and the holding in *Wood* as equivalent); *Feld v. Henry S. Levy &* *Sons, Inc.*, 37 N.Y.2d 466, 470, 335 N.E.2d 320, 322, 373 N.Y.S.2d 102, 105 (1975) ("Section 2–306 is consistent with prior New York case law."); *Beautis Prods. Co. v. Chromatic Corp.*, 1978 WL 23479 (N.Y.Sup.Ct. July 6, 1978) (treating the statutory provision and the holding in *Wood* as equivalent). The Court's suggestion in *Fakhoury Enterprises v. J.T Distributors*, No. 94 Civ. 2729, 1997 WL 291961, at *3 (S.D.N.Y. Jun.2, 1997), that "unlike the *Wood* case itself, which relied on a number of circumstances to support an inference of an implied promise, under the U.C.C., an obligation is implied by the existence of an exclusivity term alone," is inconsistent with this substantial authority.

the agent to promote the principal's endorsements of clothing designs. Rather, the Court also emphasized that the agent formed a business for the sole purpose of promoting Lady Duff–Gordon and that Lady Duff–Gordon's compensation for her endorsements was based solely on ' the profits resulting from the agent's efforts. After declaring that "[w]e are not to suppose that one party was to be placed at the mercy of the other," the Court found that "without an implied promise, the transaction cannot have such business efficacy as both parties must have intended that at all events it should have," *Wood*, 222 N.Y. at 91, 118 N.E. at 214 (citations omitted).

Cases interpreting section 2–306(2) also suggest that, for the purpose of deciding whether to impose an implied best efforts obligation on a buyer of goods, an exclusive dealing relationship should not be mechanically defined as a relationship in which a supplier has only one outlet for every good that it produces. Courts have supplied a term calling for best efforts where buyers were given an exclusive right to sell a supplier's product in a prescribed territory. *See Fusion, Inc. v. Neb. Aluminum Castings*, No. 95–2366, 1997 WL 51227, at *20 (D.Kan. Jan. 23, 1997); *Jo–Ann, Inc. v. Alfin Fragrances, Inc.*, 731 F.Supp. 149, 158 (D.N.J.1989); *Thermal Systems of Ala., Inc. v. Sigafoose*, 533 So.2d 567, 571 (Ala.1988); *Rocka v. Gipson*, 3 Ark.App. 293, 625 S.W.2d 558 (Ark. Ct.App.1981). In each of these cases, the supplier relied on a distributor in a specified territory only; if the distributor did not perform, the supplier could sell goods to any outlet outside the territory. In *Fusion*, moreover, the supplier was allowed to bypass its exclusive agent to deal directly with individual "house accounts," and yet the Court imposed a best efforts obligation on the agent. *Fusion*, 1997 WL 51227, at *20.

Finally, in *Tigg*, the requirements contract that the Court interpreted to include an implied obligation to use best efforts allowed the supplier Tigg to sell to other buyers if Dow Corning failed to buy a specified minimum number of units. *See Tigg*, 962 F.2d at 1125. Nevertheless, the Court, reasoning that the provision allowing Tigg to sell products to other buyers became effective only if Dow Corning failed to buy the mandatory minimum number of units, concluded that the contract was an exclusive dealing arrangement and that Dow Corning had an implied obligation to use best efforts in promoting Tigg's goods. *Id.* at 1125–26. The *Tigg* Court thus supplied a best efforts term in favor of a manufacturer whose exclusive dealing obligation arose only after the buyer purchased a specified number of units. Here, by contrast, the exclusive dealing obligation in the direct mail market is binding without regard to any minimum purchase by Artistic.

The common thread linking *Wood*, the territorial exclusivity cases, and *Tigg* is that these courts have not framed the inquiry, as Artistic would have this court do, as whether a supplier has no potential outlets other than a single designated buyer. Rather, in determining whether an exclusive dealing arrangement exists, these courts have focused on the hold that one commercial party has over another in a particular market.

Artistic's proposed interpretation of the exclusive dealing requirement of section 2–306(2) as a requirement that the contract preclude any supply relationship with other parties is too rigid. To impose a best efforts obligation on Artistic, Harland must demonstrate that Section 8.2 of the Master Agreement puts Harland "at the mercy of" Artistic in a particular market. Although Harland may not be able to make this showing, this court cannot de-

cide, based on the pleadings and the text of the Agreements alone, that the Agreements do not constitute an exclusive dealing arrangement.

## IV.

Harland alleges also that Artistic breached the Agreements by violating the covenant of good faith that is implied at law in a requirements contract for the sale of goods. Under New York law, every contract includes an implied covenant of good faith. *See, e.g., Apfel v. Prudential–Bache Sec., Inc.,* 183 A.D.2d 439, 439, 583 N.Y.S.2d 386, 387 (1st Dep't 1992), *modified on other grounds and aff'd,* 81 N.Y.2d 470, 600 N.Y.S.2d 433, 616 N.E.2d 1095 (1993). This implied covenant is not distinct from the underlying contract, *see Geler v. Nat'l Westminster Bank USA,* 770 F.Supp. 210, 215 (S.D.N.Y.1991), nor can it imply new or inconsistent terms into the contract, *see Bibeault v. Advanced Health Corp.,* No. 97 Civ. 6026, 1999 WL 301691, at *8 (S.D.N.Y. May 12, 1999). Thus, "[a]s a general rule, '[t]he cause of action alleging breach of [the implied covenant] is duplicative of a cause of action alleging breach of contract.'" *OHM Remediation Servs. Corp. v. Hughes Envtl. Sys., Inc.,* 952 F.Supp. 120, 124 (S.D.N.Y.1997) (quoting *Apfel,* 183 A.D.2d at 439, 583 N.Y.S.2d at 387). To the extent that Harland's good faith claim rests on Artistic's alleged breach of its implied best efforts obligation (*see* Counterclaims ¶ 41 ("Artistic has breached its ... good faith and cooperation obligations to Harland ... by failing to use its best efforts.")), the claim is duplicative.

If Harland claimed only that Artistic breached its implied covenant of good faith by failing to use best efforts, Harland's good faith claim would be facially insufficient. However, Harland alleges also that, by reducing its orders and diverting business to affiliates of MDC, Artistic breached the implied covenant of good faith that

section 2–306(1) imposes on requirements buyers. (*See* Counterclaims ¶¶ 41–42) Section 2–306(1) of the U.C.C. provides that:

"[a] term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded."

N.Y. U.C.C. § 2–306 (McKinney 2001).

Applying the plain language of the provision, courts have held uniformly that a buyer may not in good faith demand disproportionately *more* than the buyer's anticipated requirements, as measured by a stated estimate or normal or otherwise comparable prior requirements. *See Empire Gas Corp. v. Am. Bakeries Co.,* 840 F.2d 1333, 1337 (7th Cir.1988) ("This limitation is fairly easy to understand when the disproportion takes the form of the buyer's demanding more than the amount estimated. If there were no ceiling, and if the price happened to be advantageous to the buyer, he might increase his 'requirements' so that he could resell the good at a profit."); *Orange and Rockland Utils., Inc. v. Amerada Hess Corp.,* 59 A.D.2d 110, 114, 397 N.Y.S.2d 814, 818 (2d Dep't 1977) (applying New Jersey law) ("There is ... a good deal of pre-Code case law on the requirement of 'good faith'. It is well settled that a buyer in a rising market cannot use a fixed price in a requirements contract for speculation.").

However, courts have had difficulty applying section 2–306(2) to cases in which a buyer seeks to obtain *less* than an anticipated or normal quantity of goods. On its face, the "unreasonably disproportionate" provision appears to apply to increases and decreases alike, as it does not distinguish

396

between the buyer who raises his requirements and the buyer who lowers them. Further, there is language in the Official Comments pointing to symmetrical treatment of overdemanding and underdemanding cases: "the agreed estimate is to be regarded as a center around which the parties intend the variations to occur." N.Y. UCC § 2–306, cmt. 3.

On the other hand, another Official Comment states that "good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance." N.Y. UCC § 2–306, cmt. 2. Because a reduction of orders to zero would be, under many circumstances, unreasonably disproportionate to prior output or requirements, this comment suggests that the proviso does not apply when a requirements buyer decreases its orders. Comment 2 is also consistent with the common law approach, see HML Corp. v. Gen. Foods, 365 F.2d 77, 81 (3d Cir.1966) (applying New York pre-Code law) ("[T]he seller assumes the risk of all good faith variations in the buyer's requirements even to the extent of a determination to liquidate or discontinue the business."), from which section 2–306(1) was not intended to depart, see id., n. 5; Note, Requirements Contracts: Problems of Drafting and Construction, 78 Harv. L.Rev. 1213, 1220 (1965).

Two state appellate courts have applied this part of section 2–306(1) to deviations both above and below stated estimates. See Simcala, Inc. v. Am. Coal Trade, Inc., 821 So.2d 197 (Ala.2001); Romine v. Savannah Steel Co., 117 Ga.App. 353, 354, 160 S.E.2d 659, 660–61 (1968). However, most authorities, including several circuit courts, have declined to apply it to decreases in orders and held instead that a requirements buyer may decrease its orders as long as it does so in good faith. See Brewster of Lynchburg, Inc. v. Dial Corp., 33 F.3d 355, 365 (4th Cir.1994);

Empire Gas, 840 F.2d at 1337–38; R.A. Weaver and Assocs., Inc. v. Asphalt Constr., Inc., 587 F.2d 1315, 1322 (D.C.Cir. 1978).

The one court that has directly applied New York's version of section 2–306(1) to requirements contracts has also exempted decreases in orders from the "unreasonably disproportionate" proviso and concluded that "when a buyer takes less than the stated estimate in a requirements contract, the sole test is good faith." Dienes Corp. v. Long Island R.R., No. 01 Civ. 4272, 2002 WL 603043, at *5 (E.D.N.Y. Mar.19, 2002). Moreover, another federal court, applying New York law to output contracts, borrowed directly from Empire Gas's analysis of requirements contracts to conclude that, "in an output contract, the buyer takes the risk that the seller may reduce its production to zero." Canusa Corp. v. A & R Lobosco, Inc., 986 F.Supp. 723, 729–30 (E.D.N.Y.1997).

Finally, without specifically addressing the asymmetry between the treatment of increases and decreases in orders, several courts applying New York law have found that a requirements buyer need only act in good faith when reducing its purchases under a requirements contract. E.g., Laing Logging, Inc. v. Int'l Paper Co., 228 A.D.2d 843, 846, 644 N.Y.S.2d 91, 94 (3d Dep't 1996); Abrasive–Tool Corp. v. Cystic Fibrosis Found., No. 88 Civ. 1314S, 1991 WL 97445, at *4 (W.D.N.Y. May 6, 1991).

For a breach of contract claim based on section 2–306(1) of the U.C.C. to succeed, therefore, the plaintiff must demonstrate more than that the defendant reduced its buying under a requirements contract. Ultimately, Harland must demonstrate that Artistic had no legitimate business reason for reducing its orders. See NCC Sunday Inserts, Inc. v. World Color Press, Inc., 759 F.Supp. 1004, 1009 (S.D.N.Y. 1991) (applying Illinois's version of the

U.C.C.) ("In resolving the question of good faith, there is no established standard .... The proper inquiry requires an analysis of the buyer's subjective motives to determine if it had a legitimate business reason for eliminating its requirements, as opposed to a desire to avoid its contract."); *see also Brewster*, 33 F.3d at 365–66 (finding that a party to a requirements contract is not acting in bad faith if it has a business reason for scaling back its requirements); *Empire Gas*, 840 F.2d at 1339 (same).

Artistic contends that Harland's good faith claim should be dismissed because Harland and Artistic could have put a minimum requirements term in the contract but chose not to do so. However, this argument ignores the relevant authority discussed above, under which a good faith term is implied in requirements contracts, notwithstanding the absence of a mandatory minimum. By alleging that Artistic has drastically reduced its check requirements as part of a concerted plan to divert purchases from Harland, Harland has adequately pleaded bad faith, and is entitled to prove that Artistic had no legitimate business reason for reducing its purchases.

## V.

 In addition to its breach of contract claim against Artistic, Harland claims also that MDC tortiously interfered with the contracts between Artistic and Harland. Under New York law, a prima facie case of tortious interference with an existing contract requires (1) a valid contract between plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procuring of the breach, and (4) damages. *Foster v. Churchill*, 87 N.Y.2d 744, 749–50, 642 N.Y.S.2d 583, 586, 665 N.E.2d 153 (1996); *accord Antonios A. Alevizopoulos and Assocs. v. Comcast Int'l Holdings*, 100 F.Supp.2d 178, 186 (S.D.N.Y.2000); *Union*

*Carbide Corp. v. Montell, N.V.*, 944 F.Supp. 1119, 1136 (S.D.N.Y.1996).

 Where the defendants have an economic interest in the contract between a plaintiff and a third party, proving the elements listed above is not sufficient. *See Inn Chu Trading Co. v. Sara Lee Corp.*, 810 F.Supp. 501, 505 (S.D.N.Y.1992) (no possible recovery where only motive ascribed by plaintiff to defendant is economic gain). Rather, under New York law, liability will be imposed only where plaintiff can make a showing of malice on the one hand or fraudulent or illegal means on the other. *Foster*, 87 N.Y.2d at 750–51, 642 N.Y.S.2d at 587, 665 N.E.2d 153; *Ives v. Guilford Mills, Inc.*, 3 F.Supp.2d 191, 198 (N.D.N.Y.1998); *Drummond v. Morgan Stanley*, No. 95 Civ.2011, 1996 WL 631723, at *1 (S.D.N.Y. Oct.31, 1996).

Here, Harland concedes that, as Artistic's parent company, MDC has an economic interest in interfering with Artistic's contractual relations with Harland. (*See* Mem. in Supp. of Def. John H. Harland Company's Resp. to Pl's Mot. to Dismiss its Am. Countercls., at 9–10) However, Harland has pleaded that, in procuring Artistic's alleged breach of contract, MDC acted maliciously and used fraudulent or illegal means. (*See* Counterclaims ¶ 48) Because these allegations are taken as true for the purposes of this motion, and this court is not prepared to find, based on the pleadings alone, that there was no breach of contract by Artistic, Harland's counterclaim cannot be dismissed for failure to state a claim. *See U.S. Fidelity & Guar. Co. v. Petroleo Brasileiro S.A. Petrobras*, No. 98 Civ. 3099, 2001 WL 300735, at *24 (S.D.N.Y. March 27, 2001) (refusing to dismiss claim that parent company tortiously interfered with subsidiary's contract because "it cannot be determined on this motion to dismiss whether Petrobras acted out of its own economic justification

and whether the [plaintiffs] will be able to overcome any such defense"); *Ives*, 3 F.Supp.2d at 198 (refusing to dismiss a tortious interference claim because, even where a defendant has an economic interest, the defense of justification is not applicable until the defendant can show that its actions were taken to protect that interest).[4]

MDC's contention that Harland's counterclaim lacks sufficient specificity is not persuasive. Although the Alevizopoulos Court stated that "the law requires some factual specificity in pleading tortious interference," *Alevizopoulos*, 100 F.Supp.2d at 186, the allegation that a defendant acted maliciously in procuring a breach of contract is sufficient. *See Preferred Health Care, Ltd. v. Empire Blue Cross and Blue Shield*, No. 94 Civ. 9326, 1997 WL 160489, at *3 (S.D.N.Y. Apr.7, 1997) (finding that a counterclaim alleging that plaintiffs acted "with malice" was sufficient to withstand a Rule 12(b)(6) motion to dismiss); *Shaker Loudon Assocs. v. Burlington Coat Factory Warehouse Corp.*, No. 94 Civ. 0801, 1996 WL 189504, at *1 (S.D.N.Y. Apr. 16, 1996) (finding that a complaint properly alleged malice on the part of a corporate parent by claiming that "[d]efendant's interference with the Lease was without legal or moral justification . . . and an outrage warranting the imposition of punitive damages"). Indeed, the *Alevizopoulos* Court itself, rejecting the defendant's argument that the bare allegation of "but for" causation was insufficient, found that "the allegation of collusion coupled with the allegation of wrongful interference or inducement to breach, leads to the conclusion of tortious interference by the third-party." *Alevizopoulos*, 100 F.Supp.2d at 186–87. The Court also em-

phasized that, "at the pleading stage, each allegation is presumed to be true and every inference is made in plaintiffs' favor." *Id.* By this standard, counterclaimant's allegations of malice and fraud in the diversion of business from Harland and concealment of that diversion are sufficient to withstand a motion to dismiss for failure to state a claim. (*See* Counterclaims ¶¶ 46–49)

MDC asserts also that Harland's tortious interference claim should be dismissed because Harland has recognized MDC's potential interest in Artistic's supply contracts, and has not alleged specifically that MDC acted solely for the purpose of injuring Harland. However, Harland has alleged that MDC acted maliciously in procuring Artistic's breach of contract. At the pleading stage of a tortious interference action against a corporate parent, this allegation of malice, improbable as it may be where the parent is said to be meddling in its own subsidiary's affairs, is sufficient to withstand a motion to dismiss. *See Foster*, 87 N.Y.2d at 750, 642 N.Y.S.2d at 587, 665 N.E.2d 153 (noting that, even where a defendant has an economic interest in procuring a breach of contract, liability can be imposed where the plaintiff can show that the defendant acted maliciously). Although MDC can rebut the allegation of malice by establishing that its actions were taken to protect an economic interest rather than to injure Harland, *see id.* at 751, 642 N.Y.S.2d at 587, 665 N.E.2d 153, Harland's counterclaim should not be dismissed merely because MDC is Artistic's parent company. *See U.S. Fidelity*, 2001 WL 300735, at *24 (denying a motion to dismiss in a tortious interference action against a parent company

4. MDC's reliance on *Drummond* to suggest that Harland's pleadings are inadequate to overcome an economic justification defense is misplaced. *Drummond* was decided on a summary judgment motion testing the evidence, not on the pleadings. *See Drummond*, 1996 WL 631723, at *1.

where the plaintiff alleged malicious conduct on the part of the corporate parent); *Preferred Health Care*, 1997 WL 160489, at \*3 (same).

Finally, MDC argues that Harland's tortious interference claim fails because Harland has not alleged that MDC committed an independent tort in the process of procuring Artistic's breach of contract. According to MDC, without showing that MDC committed an independent tort, Harland cannot overcome MDC's economic justification defense. Yet the cases relied on by MDC are inapposite. *Foster* merely reaffirmed the rule in New York that a corporate officer charged with inducing a breach of contract can be held personally liable for his conduct only if he acts outside the scope of his employment by committing "'independent torts or predatory acts directed at another.'" *Foster*, 87 N.Y.2d at 751, 642 N.Y.S.2d at 587, 665 N.E.2d 153 (quoting *Murtha v. Yonkers Child Care Assoc.*, 45 N.Y.2d 913, 915, 411 N.Y.S.2d 219, 220, 383 N.E.2d 865 (1978)). Moreover, *Lerman v. Medical Assocs. of Woodhull, P.C.*, 160 A.D.2d 838, 554 N.Y.S.2d 272 (2d Dep't 1990) involved an at-will employment agreement. The level of interference necessary to support a finding of tortious interference with prospective contractual relations or with contracts terminable at will is significantly higher than the level of interference necessary to support a finding of interference with an existing contract. *See G–I Holdings, Inc. v. Baron & Budd*, 179 F.Supp.2d 233, 253–54 (S.D.N.Y.2001); *Union Carbide*, 944 F.Supp. at 1142. MDC thus offers no case support for the proposition that a tortious interference action against a company for procuring the breach of an existing supply contract requires a showing that the company committed an independent tort. Harland's allegation that MDC acted maliciously and used fraudulent or illegal means in procuring Artistic's breach of contract is sufficient to survive the pleading stage of the litigation.

\* \* \* \* \* \*

For the reasons stated above, plaintiffs' motion to dismiss defendant's counterclaims for failure to state a claim is denied.

SO ORDERED.