NET2GLOBE INTERNATIONAL, INC., Plaintiff,

v.

TIME WARNER TELECOM OF NEW YORK, Time Warner Telecom Holdings, Inc., and Time Warner Telecom General Partnership, Defendants.

No. 02 Civ.5004 VM.

United States District Court, S.D. New York.

July 14, 2003.

440

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Net2Globe International, Inc. ("N2G") commenced this action against defendants Time Warner Telecom Of New York, L.P., Time Warner Telecom Holdings, Inc., and Time Warner Telecom General Partnership (collectively, "TWTC") alleging violations of the Communications Act of 1934 (the "Communications Act"), as amended, 47 U.S.C. §§ 151 *et seq.* (2003), and related state law claims including breach of contract and tortious interference with contractual relations. TWTC likewise invokes applicable state law to assert counterclaims against N2G, including breach of contract, unjust enrichment, breach of the implied covenant of good faith and fair dealing, and fraud. Now before the Court are TWTC's and N2G's cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56, and N2G's motion to dismiss the counterclaims pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons set forth below, TWTC's motion is GRANTED and N2G's motion is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND [1]

N2G is a telecommunications reseller that was certified by the Federal Communications Commission as such on May 10, 2002. TWTC is primarily a domestic telecommunications carrier; it provides very limited international long distance telephone service by subcontracting for access

Ahmed A. Masoud, Massoud & Pashkoff, P.C., New York City, for plaintiff.

Gail Lee Gottehrer, Thomas G. Rohback, LeBoeuf Lamb Greene & MacRae, Hartford, CT, for defendants.

---

**1.** The factual recitation appearing below derives from the following sources: Defendants' Rule 56.1 Statement Of Material Facts In Support Of Their Motion For Summary Judgment dated February 13, 2003 ("TWTC's Rule 56.1 Statement"); Plaintiff's Response To Defendants' Statement Of Material Facts Pursuant To Local Civil Rule 56.1(b) dated March 11, 2003 ("N2G's Response Rule 56.1 Response"); Statement Of Material Facts Pursuant To Local Civil Rule 56.1 dated February 14, 2003 ("N2G's Rule 56.1 Statement"); Defendants' Response To Plaintiff's And Counterclaim Defendant's Statement Of Material Facts Pursuant To Local Civil Rule 56.1 dated March 12, 2003 ("TWTC's Rule 56.1 Response"); and the numerous affidavits and documentary attachments accompanying the parties' respective motions, responses, and reply papers. Additional citations to the record appear as necessary.

to routes owned and operated by international carriers like AT & T Corp. ("AT & T"), MCI Telecommunications Corporation ("MCI"), and Broadwing Inc. ("Broadwing").[2] In March and May 2002, the parties executed certain contracts at issue here, respectively, the Local Exchange Service Agreement dated March 27, 2002 (the "March LSA") (*reprinted as* Ex. 1.C to Plaintiff's And Counter–Claim Defendant's Motion For Summary Judgment And To Dismiss Counter–Claims), and the Local Exchange Service Agreement dated May 3, 2002 (the "May LSA") (*reprinted as* Ex. 1.D to Plaintiff's And Counter–Claim Defendant's Motion For Summary Judgment And To Dismiss Counter–Claims). Pursuant to these agreements, TWTC would provide N2G long distance telecommunications carriage for specified twelve-month periods.[3]

The provisions reflected in the March LSA and May LSA are otherwise essentially the same, and both contracts incorporate TWTC's applicable tariffs, specifically, the Terms and Conditions of International Switched Voice Service Provided by Time Warner Telecom effective January 29, 2002 (the "Tariff") (*reprinted as* Ex. 8 to Affidavit of Thomas G. Rohback In Support Of Defendants' Motion For Summary Judgment dated February 12, 2003 ("Rohback Aff.")), published in accordance with regulatory and administrative requirements. Service by TWTC to N2G commenced on or around May 10, 2002 and through June 20, 2002, N2G tendered weekly payments to TWTC. As of June 19, 2002, N2G entered into its own service contracts to resell international long distance service to eight third parties.

Shortly after service by TWTC to N2G commenced, however, TWTC discovered that all of the telephone calls initiated through N2G were directed to cellular rather than land-based telephones in Europe. According to TWTC, this circumstance resulted in considerably greater expenses to TWTC than expected because TWTC's international carrier subcontractors began, soon after TWTC commenced service to N2G, to charge much higher rates for calls terminating to cellular telephones in Europe. In turn, these differences in rates charged derived from the subcontractors' response to developments in European telecommunications regulations permitting such differential billing for calls terminating to cellular as opposed to land line telephones (the "European Differential").

In response to this state of affairs, TWTC migrated N2G's traffic from its primary international carrier subcontractor, AT & T, to networks operated by MCI and then Broadwing. It took such action allegedly because the latter two carriers implemented the European Differential in their pricing schemes after AT & T did. TWTC also invoked a safety valve clause in its Tariff, namely, § 2.2.4, to pass on to N2G the additional expenses resulting from the increased fees charged to TWTC by its international carrier subcontractors by reason of the European Differential. In the Statement Of Telephone Account dated July 1, 2002 (*reprinted as* Ex. 12 to Roh-

**2.** Broadwing was formerly known as IXC Communications, Inc.

**3.** TWTC disputes the validity of the March and May LSAs, arguing in its counterclaim that it was fraudulently induced to enter into those contracts, but it assumes for purposes of it's motion for summary judgment that valid contracts exist. (*See* Defendants' Memorandum Of Law In Support Of Their Motion For Summary Judgment dated February 13, 2003 at 2 n.2.) N2G's arguments also presume valid contracts. For present purposes, the Court, therefore, will proceed under this assumption accordingly.

back Aff.), TWTC re-invoiced service already supplied to N2G to incorporate the European Differential, and it applied the adjusted expenses to future invoices (of which there was only one, the Statement Of Telephone Account dated August 1, 2002 (*reprinted as* Ex. 17 to Rohback Aff.)). N2G refused to pay the expenses appearing in these invoices, citing a clause in the March and May LSAs providing that the rates as specified in the parties' agreement would remain unchanged for the term of service (the "Fixed Rates Provision"). As of July 13, 2002, TWTC terminated service to N2G purportedly on account of N2G's non-payment.

The parties' cross-motions address numerous issues implicating various specific factual matters presented by the evidence. Accordingly, additional details will be provided as necessary in the course of the Court's discussion of the parties' arguments.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

A motion for summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Rodriguez v. Hahn,* 209 F.Supp.2d 344, 346 (S.D.N.Y.2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). All ambiguities and reasonable inferences presented by the underlying facts must be resolved in the light most favorable to the party opposing the motion. *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000); *Trans Sport, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 188 (2d Cir.1992); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986).

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The nonmoving party "must support with specific evidence his assertion that a genuine dispute as to material fact does exist," *id.* at 324, 106 S.Ct. 2548, and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998); *Heublein, Inc. v. United States of America,* 996 F.2d 1455, 1461 (2d Cir.1993); *Trans Sport, Inc.,* 964 F.2d at 188. The opposing party's showing of a genuine dispute must be grounded in concrete evidence sufficient to support a reasonable jury's rendering a verdict in his favor, and "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Heublein, Inc.,* 996 F.2d at 1461; *Board of Managers of Soho Int'l Arts Condominium v. City of New York,* No. 01 Civ. 1226, 2003 WL 21403333, at *6 (S.D.N.Y. June 17, 2003). Ultimately, "[ ]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Mattel, Inc. v. Adventure Apparel,* No. 00 Civ. 4085, 2001 WL 1035140, at *2 (S.D.N.Y. Sept.7, 2001); *Ninacci Diamond & Jewelry Co. v. R.A.V. Investigative Servs., Inc.,* No. 95 Civ. 9302, 1998 WL 299926, at *4 (S.D.N.Y. June 9, 1998), *aff'd,* 173 F.3d 845, 1999 WL 220107 (2d Cir. 1999).

### B. *CHARGE INCREASE*

The most logical starting point for the Court's analysis of the parties' claims

concerns the construction of TWTC's Tariff § 2.2.4 and the Fixed Rates Provision because the interplay between these provisions implicates multiple arguments raised by the parties. Tariff § 2.2.4 provides:

> The Company reserves the right to discontinue service, limit service, or to impose requirements as required to meet changing regulatory or statutory rules and standards, or when such rules and standards have an adverse material affect [sic] on the business or economic feasibility of providing service, as determined by the Company in its reasoned judgment.

The Fixed Rate Provision states, in relevant part, that

> The agreed upon rate for the United Kingdom is $0.054 per minute anytime and will not rise during the term of the agreement. All other tariffed international rates in effect at the time of contract signing (list provided) will remain in effect and will not rise during the term of the agreement. Rates provided are for any and all calls to terminating countries.

As described earlier, TWTC is a domestic telecommunications carrier. (Deposition of Richard R. Davis dated September 5, 2002 ("Davis Dep.") at 150.) It owns no cable lines or routes to Europe, and augments its domestic service in order to provide international long distance service by subcontracting for such service with other carriers that do own and operate international routes and cables. (Affidavit of Richard R. Davis In Support Of Defendants' Opposition To Plaintiff And Counterclaim–Defendant's Motion For Summary Judgment And To Dismiss Counterclaims dated March 6, 2003 ("Davis March Aff."), ¶ 4 (reprinted as Ex. 2 to Affidavit Of Gail L. Gottehrer In Support Of Defendant's Opposition To Plaintiff And Counterclaim–Defendant's Motion For Summary Judgment And To Dismiss Counterclaims dated March 10, 2003.)) These subcontractors were permitted by European regulatory rules and standards to charge considerably more for calls terminating to cellular telephones than to land line telephones, up to five times as much in some cases. (See, e.g., Affidavit of Avi Horowitz dated November 7, 2002, ¶ 6 (reprinted as Ex. 35 to Rohback Aff.); Affidavit of Richard R. Davis dated February 10, 2003 ("Davis February Aff."), ¶ 12 (reprinted as Ex. 31 to Rohback Aff.); Deposition of James Giannoit dated September 11, 2002 ("Giannoit Dep.") at 110, 115, 203 (reprinted as Ex. 2 to Rohback Aff.)) The subcontractors began charging the European Differential as TWTC commenced service to N2G on May 10, 2002.[4]

At the time of the parties' dealings, less than one-half of one percent of TWTC's traffic, excluding that generated by demand from N2G, was international. (Davis Dep. at 150.) TWTC asserts that it did not become aware of the European Differential, as American law includes no comparable differentiation, until it received and reviewed initial expense reports from its international carrier subcontractors reflecting costs assessed against TWTC for calls originating through N2G. (Davis February Aff., ¶ 11; Davis March Aff., ¶¶ 8, 11.) In response, TWTC attempted to pass these additional charges for calls terminating to cellular telephones along to N2G. Despite the fact that its published rates did not include differences in pricing

---

**4.** The record is unclear as to when these European regulations and standards were enacted or amended to permit such differential billing to land line and cellular telephones, but the record does indicate that AT & T's charges began to reflect this differential as of May 17, 2002 and that MCI's and Broadwing's charges did so in June and July 2002, respectively. (Davis March Aff., ¶¶ 12, 14.)

for calls terminating to cellular as opposed to land line telephones, TWTC argues that the increase was authorized by Tariff § 2.2.4 because the European Differential, given the high volume of calls directed to TWTC from N2G and terminating to cellular telephones, was economically unfeasible for TWTC. N2G counters that the Fixed Rates Provision of its contracts with TWTC precluded this additional charge because it amounts to a rate increase precluded by the Fixed Rate Provision and because § 2.2.4 is invalid, as it would permit any increase in rates as long as such increase were to be subjectively labeled and defined so as to fall within the terms of § 2.2.4.

■ As indicated above, N2G's contracts with TWTC incorporated TWTC's published tariffs. It is axiomatic under New York law that courts interpret a contract so as to give effect to all of its provisions and "cannot and should not accept an interpretation that ignores the interplay of the terms, renders certain terms 'inoperable,' and creates a conflict where one need not exist." *Pearce, Urstadt, Mayer & Greer Realty Corp. v. Atrium Dev. Assocs.,* 77 N.Y.2d 490, 568 N.Y.S.2d 890, 571 N.E.2d 60, 64 (1991); *see Consolidated Edison Co. v. Allstate Ins. Co.,* 98 N.Y.2d 208, 746 N.Y.S.2d 622, 774 N.E.2d 687, 693 (2002); *Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 217 N.Y.S.2d 1, 176 N.E.2d 37, 38 (1961). N2G contends that permitting the cost increase reflecting the European Differential under § 2.2.4 renders the Fixed Rates Provision inoperable, and TWTC responds that invoking a provision purporting to fix rates in order to categorically bar any increases in charges renders § 2.2.4 inoperable. Although admittedly the matter is a close call, the Court is persuaded that TWTC has the better argument.

It is clear that an overbroad construction of either provision will render the other meaningless. Accordingly, the Court's task requires reconciling the two in some meaningful way such that both provisions have force and effect. Because of the breadth of the potential coverage of § 2.2.4, the Court will restrict its consideration to the facts at hand. It is true that the additional charge imposed by TWTC resulted in an increase in the amount N2G had to pay for service. Nonetheless, broader and substantive consideration persuades the Court to construe that increase as falling within the ambit of § 2.2.4 and, further, as not precluded by the Fixed Rates Provision.

First, as indicated, international long distance calls comprised less than one-half of one percent of TWTC's call volume, excluding the services rendered to N2G. Because of this limited overseas presence, TWTC had no reason to differentiate between calls terminating to cellular and land line telephones in its published tariff rates, inasmuch as the economic impact of any such differential would be absorbed by the overwhelming majority of revenue and cost assessments associated with domestic service. In fact, TWTC points out that its billing system in 2002 could not even differentiate between calls terminating to land line as opposed to cellular telephones in Europe.[5] (Davis March Aff., ¶ 8.)

Second, TWTC does not own any overseas cables or routes, and it subcontracted that portion of its service to other telecommunications carriers. The record indicates that European regulatory standards permitted these subcontractors to charge more for telephone calls terminating to

---

**5.** Once alerted to the impact of the European Differential given N2G's call volume terminating to cellular telephones, TWTC began monitoring N2G's calls and service requirements manually. (Davis March Aff., ¶ 8.)

cellular telephones, and that these subcontractors in fact did charge more as permitted and passed that expense along to TWTC. In this way, while the European standards did not directly impact TWTC, they did indirectly, through TWTC's subcontractors, impact the company in a material way. When TWTC's international call volume increased as a result of N2G's demand, the financial impact of this differential pricing became economically unfeasible for TWTC. For example, monthly billing statements indicate that the services rendered to N2G for approximately the first month of service, from May 20, 2002 through June 25, 2002, assessed so as to include the European charge differential for telephone calls to cellular telephones, totaled $1,721,323.49, whereas the payments made by N2G omitting this differential for this period of service amounted only to $300,000. (Davis February Aff., ¶¶ 19, 26, Ex. E (Invoice dated July 16, 2002); Statement Of Telephone Account dated July 1, 2002; Statement Of Telephone Account dated August 1, 2002; TWTC Rule 56.1 Statement, ¶¶ 8, 9; N2G Response Rule 56.1 Statement, ¶¶ 8, 9.) Indeed, the Fixed Rates Provision itself values N2G's anticipated minimum usage

requirement for international call volume at $1 million for the *entire year.* (March LSA at 4; May LSA at 4.) TWTC represents that the far higher cost differential N2G would have it absorb would mean "absolute economic ruin" for the company, and that the increase in charges assessed against N2G reflected this European Differential as a so-called "pass through" of this expense. (Davis February Aff., ¶ 13.) N2G does not raise a challenge to either contention.[6] For these reasons, TWTC's additional charge reflecting the European Differential falls within the scope of § 2.2.4 as defined in TWTC's Tariff.

The Court is further persuaded to construe TWTC's additional charge reflecting the European Differential as an additional cost pursuant to § 2.2.4, in accordance with the terms of that section as discussed above, rather than as a rate increase, because doing so permits both § 2.2.4 and the Fixed Rate Provision to meaningfully coexist as essential elements of the parties' underlying agreement, thus adhering to and effectuating fundamental tenets of contract interpretation. *See Pearce, Urstadt,* 568 N.Y.S.2d 890, 571 N.E.2d at 64. The European Differential charges can properly be understood to be an added

---

**6.** There is no allegation, for example, that the additional cost TWTC seeks to pass on to N2G reflects an attempt by TWTC to increase its profit margin or otherwise enlarge its revenue beyond its own costs incurred as a result of the European regulations and standards that, in turn, result in differing charges by TWTC's subcontractors for calls terminating to land line and cellular telephones. N2G does assert that the increase reflected additional expenses to TWTC imposed as a result of newly negotiated contracts with TWTC's subcontractors. (*See* Memorandum Of Law In Support Of Plaintiff's And Counter–Claim Defendant's Motion For Summary Judgment And To Dismiss Counter–Claims dated February 14, 2003 ("N2G February 14 Br.") at 6.) The evidence, however, indicates that TWTC's carriage contracts with MCI and Broadwing were formed in 1997 and 1998, respectively,

and the record does not indicate that TWTC executed new carriage contracts with these two providers since that time. (Davis March Aff., ¶¶ 9,13, Ex. B and C.) TWTC's contract with AT & T was renegotiated on May 17, 2002 but this action was taken specifically to reflect the recently changed European regulations and standards allowing for differential billing to calls terminating to land line and cellular telephones, and, in the same vein, MCI and Broadwing also informed TWTC in June and July 2002, respectively, that they intended to increase their fees for calls terminating to cellular telephones to reflect these European standards and regulations. (Davis March Aff., ¶¶ 9–14, Ex. A—C.) Accordingly, in each case, the underlying source of the cost increase to TWTC is the European Differential.

layer of expense over and above TWTC's published rates triggered only when a given call terminates to a cellular telephone in Europe. In that case, the tariff rates still exist as one of various components of TWTC's total expense, which would comprise not only the published tariff rate but also the European Differential charge, as well as other layers of expenses including potentially varying federal, state, and local taxes and surcharges contemplated by the parties' agreement. *See e.g.,* Tariff § 2.9.3 (providing for the itemized delineation of "[a]ll applicable federal, state and local taxes" on customers' bills); *Connecticut Office of Consumer Counsel v. Federal Communications Comm'n,* 915 F.2d 75, 79 (2d Cir.1990) (allowing a pass through of expenses, reflecting state surcharges imposed on telecommunications providers, to be assessed against customers in certain states even though comparable surcharges are not assessed in all states).

N2G argues that § 2.2.4 only applies to "changing" regulations or standards and that TWTC identifies no such changes. The Court rejects this argument as inconsistent with the plain language of § 2.2.4, which provides in relevant part for additional "requirements as required to meet changing regulatory or statutory rules and standards, *or* when such rules and standards have an adverse material affect on the business or economic feasibility of providing service . . . ." (emphasis added.) The section's use of the disjunctive conjunction, "or," which, along with the preceding comma, setting off a second conditional clause, indicates that two propositions are being delineated—one for circumstances involving changing rules and standards and another involving materially adverse effects of regulatory rules and standards irrespective of any change.

Additionally, Tariff § 2.9.3 requires that "[a]ll applicable federal, state, and local taxes" appear on a bill as a separate line item, yet TWTC did not separately itemize the increase reflecting the European Differential, and N2G argues that the decision to include this differential as part of the invoice category entitled "Time Warner Telecom Long Distance Usage," (Statement Of Telephone Account dated July 1, 2002; Statement Of Telephone Account dated August 1, 2002), indicates that this charge was a rate increase as contemplated by the Fixed Rate Provision rather than an add-on cost or surcharge[7] as provided for in § 2.2.4. The Court disagrees. There is nothing in the title of this line item that inherently confines or implies a limitation of the expenses there encompassed as the product of nothing but usage rates to the exclusion of other categories of relevant expenses. While TWTC's billing practice in this regard may be inconsistent with the technical requirements of itemizing a bill reflected in Tariff § 2.9.3, the Court is more concerned with the substance underlying the additional charge and not with the formalities and logistics of its labeling or layout. In this vein, the Court notes that N2G's president and chief executive officer, James Giannoit ("Giannoit"), himself has, at times, used the terms, "rate," and "surcharge," interchangeably within the context of this very litigation. (*See, e.g.,* Declaration of James R. Giannoit dated July 3, 2002, ¶¶ 10, 14–16 ("I knew that some carriers were assessing 'surcharges,' or higher rates, for calls . . . .") (*reprinted as* Ex. 16 to Rohback Aff.).) Furthermore, the Court notes

---

7. Part of the confusion in the present dispute and in the parties' interpretation of relevant case law discussed below appears to lie with differing usage of the word "surcharge" arising in the various contexts at issue. For this reason, the Court, for purposes of its analysis of the parties' claims, attempts to minimize the use of this contractually undefined term.

that N2G as a matter of substance does not challenge TWTC's representation that the increase it was asked by its subcontractors to pay, which it in turn sought to pass on to N2G—however labeled—generally coincided, both in timing and amounts, with the European Differential; N2G argues instead that such an increase is precluded by the parties' agreement and, in turn, applicable law. Finally, the European regulatory and statutory rules and standards providing for differential billing for calls terminating to land line and cellular telephones would appear to fall outside the scope of § 2.9.3 anyway as determined by its plain language since they can not be classified as "federal, state or local taxes" within the accepted plain meaning of those terms.

N2G also argues that to construe the European Differential as an add-on expense pursuant to § 2.2.4 means that TWTC's "rate guarantees are worthless." (N2G February 14 B.R. at 23–24.) In support of this argument, N2G relies on *Frontline Communications Int'l, Inc. v. Sprint Communications Co., L.P.*, 178 F.Supp.2d 432 (S.D.N.Y.2001), to argue that the imposition of an additional charge for service amounts to a rate increase in violation of the Fixed Rates Provision. The Court disagrees with this reading and, in fact, understands the reasoning of that decision as consistent with, and even perhaps compelling, the outcome reflected in this Court's ruling on the matter at hand.

In *Frontline*, the defendant, Sprint Communications Co. ("Sprint"), amended its tariff to carve out a category of expense, which it referenced as "surcharges," from the so-called "Net Effective Usage Rate," which, by contract, Sprint had committed to keeping fixed. The issue, then, was whether Sprint could properly so *redefine* a term reflecting payments it had contractually committed to keep constant, and then increase the costs assessed

against customers like the plaintiff within that carved out category of expenses— costs that, but for Sprint's unilateral redefinition of terms, were contractually fixed. The *Frontline* court held that to permit such a carving out maneuver after the parties' contract had been executed would render Sprint's commitment to maintain fixed rates meaningless. In contrast, neither party in the present dispute is redefining contractual terms to carve out a category of expenses from the Fixed Rates Provision. Rather, the dispute concerns how properly to classify, under the contractual terms bargained for and mutually accepted, a particular charge not specifically provided for under the parties' agreement, and whether the European Differential properly falls within one or the other contract terms as defined from the outset.

In this vein, the Court notes that the *Frontline* court arrived at its conclusion in part by relying on the existence of a safety valve provision similar to § 2.2.4. That provision read as follows:

> 5. Regulatory Programs. Sprint may impose additional charges on Customer to recover amounts Sprint is required by regulatory or other governmental authorities to collect on behalf of or pay to others in support of statutory regulatory programs, plus associated administrative costs.

*Frontline*, 178 F.Supp.2d at 438. The Court explained:

> Standard provision No. 5 is also difficult to harmonize with Sprint's reading of the [contract].... Defendant's argument that it is entitled to change the underlying definition of Net Effective Usage Rate would make it unnecessary to reserve the right to "impose additional charges" elsewhere in the [contract].

*Id.* Accordingly, the reasoning in *Frontline* implicitly approves of a safety valve provision like § 2.2.4 in spite of the carrier's

coexisting commitment to maintain fixed rates.

The Court notes that TWTC, once alerted to the European Differential and its potential consequences through its dealings with N2G, did amend, on September 10, 2002 and December 13, 2002, portions of its published tariffs, specifically, Tariff §§ 2.0 and 2.8, to incorporate the costs of the European Differential, ultimately referring to this charge as an alternate rate. (Defendants' Responses To Plaintiff's First Set Of Requests For Admissions Directed To Defendants December 23, 2002, ¶¶ 48, 50, 52 (*reprinted as* Ex. 38 to Plaintiff's And Counter–Claim Defendant's Motion For Summary Judgment And To Dismiss Counter–Claims); Time Warner Telecom Holdings Inc. International Price List No. 1, effective December 13, 2002 (*reprinted as* Ex. 32 to Plaintiff's Opposition To Defendants' Motion For Summary Judgment).) The fact that TWTC, once having become aware of the European Differential, ultimately decided to present this cost to its customers as a component of applicable rates rather than as some sort of known but undisclosed add-on charge or surcharge, does not undermine its decision, in the first instance, to pass through the effects of the differential to N2G pursuant to § 2.2.4. This result follows because N2G was TWTC's first customer with sufficient service demands to make an issue of the European Differential given TWTC's theretofore minimal international long distance call volume, and because service to N2G commenced just as the effects of the European Differential began to materialize.

For these reasons, the Court concludes that: Tariff § 2.2.4 authorized TWTC to pass through to N2G additional charges reflecting differential costs for calls terminating to land line and cellular telephones permitted by the European statutory and regulatory scheme; that the Fixed Rates Provision did not preclude this action; and

that § 2.2.4 and the Fixed Rates Provision can meaningfully coexist with force and effect as regards this additional charge.

## C. *RECOVERABLE DAMAGES*

### 1. *Actual Damages*

■ It is undisputed that all of N2G's customers paid N2G in full for the service they received. (TWTC Rule 56.1 Statement, ¶ 21; N2G Response Rule 56.1 Statement, ¶ 21.) It is also undisputed that N2G did not cover the loss of service from TWTC by obtaining long distance service from a substitute telecommunications carrier. (TWTC Rule 56.1 Statement, ¶ 22; N2G Response Rule 56.1 Statement, ¶ 22.) N2G identifies no other basis for claiming actual damages. Accordingly, even assuming N2G were to establish liability, it is nonetheless undisputed that N2G may not recover actual damages pursuant to any of its claims against TWTC.

### 2. *Lost Profits and Limitation of Liability*

■ N2G does claim consequential damages in the form of lost profits from continued performance of its contracts with its customers beyond July 12, 2002. TWTC objects to N2G's claim for such damages in light of the parties' contractual limitation of liability agreement, which provides: "In no event shall the Company [TWTC] be liable for any incidental, indirect, special, or consequential damages (including lost revenue or profits) of any kind whatsoever regardless of the cause or foreseeability thereof." (Tariff § 2.13.2.) Assuming liability were established, the plain language of this contractual provision precludes recovery by N2G of lost profits. N2G argues that this provision is void on various grounds. The Court disagrees.

 The New York Court of Appeals has declared that

> [a] limitation on liability provision in a contract represents the parties' Agreement on the allocation of risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor.... [The parties] may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made.

*Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 618 N.Y.S.2d 882, 643 N.E.2d 504, 507 (1994) (quoting 5 Corbin, *Corbin on Contracts*, § 1068, at 386 (1964)); *see DynCorp v. GTE Corp.*, 215 F.Supp.2d 308, 317–18 (S.D.N.Y.2002); *World–Link, Inc. v. Citizens Telecomm. Co.*, No. 99 Civ. 3054, 2000 WL 1877065, at *5 (S.D.N.Y. Dec.26, 2000); *Peluso v. Tauscher Cronacher Prof'l Eng'rs, P.C.*, 270 A.D.2d 325, 704 N.Y.S.2d 289, 290 (App. Div. 2nd Dep't 2000); *Scott v. Palermo*, 233 A.D.2d 869, 649 N.Y.S.2d 289, 290–91 (App. Div. 4th Dep't 1996). But the Court of Appeals has also explained that

> an exculpatory agreement ... will not exonerate a party from liability under all circumstances.... [I]t will not apply to exemption of willful or grossly negligent acts ... [or when] the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith. Or when, as in gross negligence, it betokens a reckless indifference to the rights of others, it may be implicit.

*Kalisch–Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 448 N.E.2d 413, 416–17 (1983) (citations omitted); *see Gross v. Sweet*, 49 N.Y.2d 102, 424 N.Y.S.2d 365, 400 N.E.2d 306, 308–309 (1979). "Gross negligence, when invoked to pierce an agreed-upon limitation of liability in a commercial contract, must 'smack of intentional wrongdoing'.... It is conduct that evinces a reckless indifference to the rights of others." *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 583 N.Y.S.2d 957, 593 N.E.2d 1365, 1370–71 (1992) (citations omitted) (quoting *Kalisch–Jarcho, Inc.*, 461 N.Y.S.2d 746, 448 N.E.2d at 416). "'Malice,' in law, is a state of mind intent on perpetrating a wrongful act to the injury of another without justification." *Kalisch–Jarcho, Inc.*, 461 N.Y.S.2d 746, 448 N.E.2d at 416–17 (citation omitted).

While issues of malice, willfulness, and gross negligence often present questions of fact, courts have sustained limitation of liability provisions in the context of a summary judgment motion when the surrounding facts compel such a result. *See, e.g., DynCorp*, 215 F.Supp.2d at 318 (dismissing breach of contract claims for consequential, special, or punitive damages in light of contractual limitation of liability, finding that the parties "unambiguously provided the limit of recovery in the event of a breach, and [the Court] may not rewrite how the parties defined their rights and obligations, allocated their risks, and limited their liabilities and rights of recovery."); *Alleyne v. Four Seasons Hotel New York*, No. 99 Civ. 3432, 2001 WL 135770, at *16–*18 (S.D.N.Y. Feb.15, 2001) (summary judgment granted in light of contractual limitation of liability clause); *World–Link*, 2000 WL 1877065, at *5 (finding consequential damages prohibited by contractual limitation of liability provision, the court stated: "It may have been unwise, given the nature of its business, for World–Link to enter an Agreement containing such a provision. But it did...."); *Ninacci Diamond & Jewelry Co. v. R.A.V. Investigative Servs., Inc.*, No. 95 Civ. 9302, 1998 WL 299926, at *5 (S.D.N.Y. June 9, 1998), *aff'd*, 173 F.3d 845, 1999 WL 220107

(2d Cir.1999) ("[W]hile [the defendant] may have been negligent ..., these failings do not rise to the level of 'gross negligence' required to void a contractual waiver of liability."); *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 595 N.Y.S.2d 381, 611 N.E.2d 282, 284 (1993) ("[The evidence,] while perhaps suggestive of negligence or even 'gross negligence' as used elsewhere, does not evince the recklessness necessary to abrogate [the plaintiff's] agreement to absolve [the defendant] from negligence claims."); *David Gutter Furs v. Jewelers Prot. Servs., Ltd.*, 79 N.Y.2d 1027, 584 N.Y.S.2d 430, 594 N.E.2d 924, 924–25 (1992) ("Taken together, these allegations do not raise an issue of fact whether defendant performed its duties with reckless indifference to plaintiff's rights....").

■ N2G first argues that the liability clause is void on public policy grounds. According to N2G, by passing along additional charges reflecting the European Differential, TWTC increased its rates selectively and without notice, in violation of the policy underlying the Communications Act. For the reasons stated in Section II.B *supra*, however, the Court has already concluded that this pass through of expenses is not properly construed as a rate increase but, rather, an add-on expense authorized pursuant to § 2.2.4 of TWTC's published Tariff. The Court further concludes in Section II.D(2) *infra* that any attendant differential treatment reflected in this pass through of expenses pursuant to § 2.2.4, experienced by N2G as compared to TWTC's other customers, was not unreasonable or discriminatory. Therefore, the Court rejects these arguments recast in the present context.

■ N2G also argues that TWTC's actions constitute malice and intentional wrongdoing that render the liability provision void. Specifically, N2G contends that TWTC migrated N2G's traffic from AT & T to MCI and Broadwing routes and thereby reduced its quality of service. (Plaintiff's Memorandum Of law In Opposition To Defendant's Motion For Summary Judgment dated March 13, 2002 ("N2G March 13 B.R. at 11–13.") N2G itself, however, admits that this migration occurred in response to AT & T's implementation of higher charges reflecting the European Differential. (*Id.* at 11.) Because AT & T implemented these higher charges before MCI and Broadwing did, *see id.* (citing Deposition of Kimarie Mikleton dated December 4, 2002 ("Mikleton Dep.") at 88–89, 93 (*reprinted as* Ex. 31 to Plaintiff's Opposition To Defendant's Motion For Summary Judgment)), TWTC's decision to reroute traffic over MCI's and Broadwing's networks amounted to an effort to mitigate costs and consequentially diminish the amount of the charges passed on to N2G. Despite the attendant effect on N2G's service, this economically motivated decision cannot, as a matter of law, rise to the level of malice or intentional wrongdoing necessary to invalidate the contracts' limitation on liability provision.

In reaching this conclusion, the Court finds the decision of the New York Court of Appeals in *Metropolitan Life* particularly persuasive. In that case, the defendant software provider committed to supplying the plaintiff with software for processing insurance claims along with customized adaptations and enhancements in accordance with the plaintiff's needs as projected when the contract was formed. When the expense of supplying the necessary enhancements apparently turned out to be greater than projected, the defendant demanded payment in excess of the ceiling established by the contract. Upon the plaintiff's refusal to pay the differential, the defendant withdrew from the project and provided no further service. The plaintiff sued for breach of contract, and the defendant invoked a limitation of liabil-

ity clause that absolved the defendant of liability for consequential damages other than those caused by "intentional misrepresentations, willful acts and gross negligence." 643 N.E.2d at 509. The Court of Appeals held that the limitation of liability clause insulated the defendant from the specified portions of the plaintiff's alleged injuries because

> the proof ... was that defendant's repudiation of the Agreement was motivated exclusively by its own economic self-interest in divesting itself of a highly unprofitable business undertaking in order to promote the sale of its computer software division to a competitor company. Consequential damages resulting from that kind of contract nonperformance constitute a risk which plaintiff assumed under [the limitation of liability provision of the parties' contract].

*Id.* at 439, 618 N.Y.S.2d 882, 643 N.E.2d 504.

*Metropolitan Life* materially parallels the facts of the case at bar. TWTC did not anticipate the European Differential at the time the parties' contracts were negotiated and executed, as reflected by the following circumstances: TWTC is a domestic carrier; less than one-half of one percent of its carriage (excluding that generated by N2G) was international; TWTC owned no international routes or cables of its own; and TWTC's international carriage subcontractors' fees did not, at that time, present independent rates reflecting the European Differential. Once the impact of the European regulatory scheme manifested itself and rendered performance economically unfeasible for TWTC, TWTC increased its charges to N2G by passing along its own increased costs charged by the subcontractor carriers, as did the defendant in *Metropolitan Life.* And when N2G refused to pay this added charge, TWTC discontinued service, again, in parallel to the facts of *Metropolitan Life.* Accordingly, the conclusion by the New York Court of Appeals that such behavior does not constitute intentional misrepresentation, willfulness, or gross negligence extends to the present dispute.[8] Indeed, the very existence of a safety valve provision permitting the implementation of such a measure, embodied in § 2.2.4, itself lends further support to this conclusion.

■ This result extends not only to TWTC's decision to migrate N2G's service, but to the alleged subsequent decline in quality of service stemming largely from what is claimed to be historically poorer performance by MCI and Broadwing than that provided by AT & T, and from the availability of fewer conduits and cables to carry and backup N2G's traffic.[9] In consequence, N2G asserts that according to complaints made to TWTC by N2G, call completion rates dropped from 68 percent before migration to below 40 percent and,

---

**8.** To be clear, in *Metropolitan Life,* the limitation of liability clause itself excluded these kinds of activities—those amounting to "intentional misrepresentations, willful acts and gross negligence"—from its purview. In the present case, N2G argues that when presented with a broader limitation of liability clause that purports to preclude damages for even this sort of behavior, New York law steps in and renders that portion of its purported coverage invalid. Either way, the question remains whether the given activity rises to that higher level, and the Court of Appeals in *Metropolitan Life* concluded that behavior such as that at issue here does not.

**9.** N2G argues that its call traffic was routed across 17 to 20 so-called DS–1 cables rather than the agreed-upon 28, which, together, would correspond to the bandwidth equivalent of a single so-called DS–3 cable. (N2G February 14 B.R. at 6–7; N2G March 13 B.R. at 11, Ex. 42 (TWTC Trouble Ticket No. SW–020628–008709).) TWTC disputes this claim. (Davis March Aff., ¶ 7.) The Court will resolve this dispute in N2G's favor for purposes of the present motion.

at times, 20 percent.[10] (N2G March 13 B.R. at 11, Ex. 42 (TWTC Trouble Ticket No. SW–020628–008709).) Nonetheless, the record indicates that TWTC charged N2G only for completed call time throughout their business dealings. (TWTC Rule 56.1 Statement, ¶ 19; N2G Response Rule 56.1 Statement, ¶ 19.) While these circumstances may arguably present a basis for N2G to assert liability on the part of TWTC, they do not constitute the level of malice or intentional wrongdoing necessary to invalidate § 2.13.2.

Various decisions of New York courts illustrate a requisite showing of wrongful conduct notably more extensive and culpable than what N2G has provided to invalidate a limitation of liability provision. For example, in *Sommer*, the plaintiff asked the defendant fire alarm company to deactivate its alarm system because of work being done at the building. The defendant reactivated the system later that night in accordance with usual procedure. Later, the plaintiff, who was unaware that the system had been reactivated, contacted the defendant and asked that the alarm be reactivated. The defendant's dispatcher became confused and simply took the system out of service. Shortly thereafter, a four alarm fire erupted in the premises, but the dispatcher simply assumed that he should ignore the signals. The Court of Appeals found these facts to present a triable issue of fact as to whether the defendant's behavior constituted simple mistake or reckless indifference. *See Sommer*, 583 N.Y.S.2d 957, 593 N.E.2d at 1371.

In *Hanover Ins. Co. v. D & W Cent. Station Alarm Co.*, 164 A.D.2d 112, 560 N.Y.S.2d 293 (App. Div. 1st Dep't 1990), the defendant alarm company received two alarm signals from the plaintiff's premises but did not dispatch a guard until almost one and one-half hours later, and it did not notify the police until almost five hours thereafter. The defendant's guard left the premises without investigating the interior of the building because he was unable to gain access, and when he contacted his dispatcher to explain his situation he was told to "forget that assignment and go on to another guard run." *Id.* at 294. This behavior was held to present an issue of fact as to whether the defendant was grossly negligent. *Id.* at 295–96.

In *Kleartone Transparent Prods. Co. v. Dun & Bradstreet, Inc.*, 88 A.D.2d 353, 453 N.Y.S.2d 433 (App. Div. 1st Dep't 1982), the plaintiff, a subscriber of the defendant's credit reporting service, filed suit alleging inaccurate reporting as regards a particular company's credit rating. The

---

**10.** N2G asserts that TWTC intentionally and actively manipulated its circuits to impair the quality of service N2G received. N2G makes various inferences about the operation of TWTC's overall system and supposed implications of intentional manipulation essentially based on a broad, speculative, and conclusory reading of a TWTC technician's brief notations made in the course of investigating N2G's quality of service complaints. (N2G March 13 B.R. at 15–16; TWTC Trouble Ticket No. SW–020628–008709.) The Court is unmoved by such conjecture. *See Harlen Associates v. The Incorporated Village of Mineola*, 273 F.3d 494, 502 (2d Cir.2001) ("Although the issue of whether an action was motivated by malice generally is a question of fact properly left to the jury, we will uphold a grant of summary judgment where the nonmoving party adduces nothing more than speculation to support its claims."); *Pocchia v. NYNEX Corp.*, 81 F.3d 275, 280 (2d Cir. 1996) ("[The plaintiff's] added assertion that the plan must have been considered prior to his resignation because [the defendant] was notoriously slow in implementing changes is simply too speculative to defeat a motion for summary judgment."); *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir.1995) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." (citation omitted; internal quotations omitted)).

defendant was alleged to have intentionally omitted from its report a collection claim that its own collection arm (as opposed to its credit reporting arm) was hired to pursue. The First Department found a triable issue of fact as to whether the defendant's actions constituted gross negligence, thus invalidating the limitation of liability clause, explaining:

> The instant case, involving a failure to report collection information in [the defendant company's] possession, is distinguishable from other cases where the credit agency merely failed to adequately investigate certain material.... Not only was the information already in [the defendant's] possession when the first credit report was sent out, but it placed [the defendant] in what appears to be a conflict of interest. Indeed, ... testimony supports an inference that [the defendant] had a conscious policy that its own collections not be revealed to its subscribers.

*Id.* at 435–36 (citations omitted).

Similarly, in *United States v. Merritt Meridian Constr. Corp.*, 95 F.3d 153 (2d Cir.1996), the plaintiff subcontractor entered into an agreement with the defendant general contractor to provide trench-work and pipeline installation services. A dispute over payment and performance ensued that was resolved via jury verdict in plaintiff's favor. On appeal, the Second Circuit sustained the jury's finding of malice and bad faith, invalidating the parties' contractual limitation of liability agreement, based on the defendant's repeated broken promises to provide surveyors necessary for plaintiff's work, payment delays resulting in lack of capital that prevented plaintiff from hiring sufficient personnel to meet its obligations, "grossly inflated backcharges" designed to "break" the plaintiff company, and the theft by the defendant of $20,000 worth of plaintiff's material. *Id.* at 167.

By contrast, several other decisions on point illustrate the far higher mark at which New York courts place the bar and, also, the effects of wrongful conduct sufficient as a matter of law to nullify a limitations of liability clause in contract—demanding nothing short of in a compelling demonstration of egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts. In *Colnaghi, U.S.A., Ltd.*, for instance, the plaintiff art gallery was burglarized as a result of the defendant alarm company's failure to secure a skylight on the premises. The Court of Appeals rejected the plaintiff's challenge to the limitation of liability provision in the parties' contract, explaining that "the failure to wire a skylight, while perhaps suggestive of negligence or even 'gross negligence' as used elsewhere, does not evince the recklessness necessary to abrogate [the plaintiff's] agreement to absolve [the defendant] from negligence claims." 611 N.E.2d at 284.

In *David Gutter Furs v. Jewelers Prot. Servs., Ltd.*, the plaintiff fur dealer was the victim of a burglary during which its alarm system did not sound. The plaintiff sued its alarm company for negligence. In the context of the defendant's summary judgment motion, the Court of Appeals rejected the plaintiff's challenge to the contractual provision limiting the defendant alarm company's liability, stating:

> Plaintiff's assertion of gross negligence is based on its expert's opinion that there should have been two motion detectors, instead of one, on each level; a shock sensor should have been installed; defendant should have ascertained how the inventory would be arranged; and a post-occupancy inspection should have been undertaken. Taken together, these allegations do not raise an issue of fact whether defendant performed its

duties with reckless indifference to plaintiff's rights....

594 N.E.2d at 924–25.

Similarly, in *Ninacci Diamond,* the organizer of a trade show was sued by a vendor whose merchandise was stolen during a burglary of the show's storage room that was accessible through an unbeknownst passageway in the ceiling space. The contract between the vendor and the organizer included a limitation of liability provision, but the vendor claimed the organizer was grossly negligent for protecting the storage area with a guard for only two hours in the morning and two hours in the evening despite the following additional recommendations by the security company hired to protect the premises, which the organizer rejected: posting one full time armed guard inside the storage area and one outside of it; hiring two additional guards to patrol the overall premises; installing a surveillance camera inside the storage room; and having the security company maintain control of the keys to the room. In granting summary judgment to the defendants, the Court concluded that "while [the organizer] may have been negligent ..., these failings do not rise to the level of 'gross negligence' required to void a contractual waiver of liability." 1998 WL 299926, at *5.

The circumstances surrounding the quality of service reduction proposed by N2G as a basis for invalidating the parties' limitation of liability agreement in this case do not rise to the level of egregiousness evident in *Sommer, Hanover Ins., Kleartone,* and *Merritt Meridian* and may be, at best, akin to the facts of cases such as *Colnaghi, David Gutter Furs,* and *Ninacci Diamond.* Accordingly, the Court must reject N2G's argument that § 2.13.2 is invalid on this basis.

▮ N2G also presents, as a basis to infer malice or intentional wrongdoing and, in turn, invalidate § 2.13.2, the fact that TWTC discontinued service with less than 30 days' notice rather than the 120 days dictated by the March LSA and May LSA. (N2G March 13 B.R. at 13.) TWTC did not flatly terminate service pursuant to § 2.2.4, however. Instead, in a letter dated June 14, 2002, it provided N2G with the option of continuing to receive service by accepting the expense increase reflecting the European Differential,[11] (Rohback Aff., Ex. 7), costs which N2G itself was apparently free to pass through to its customers under its own contracts with them, (N2G form Customer Carrier Service Agreements, ¶ 1.D *(reprinted as* Ex. 20–27 of Rohback Aff.)). Only when N2G refused to accept this option in a letter to TWTC dated June 17, 2002, (Rohback Aff., Ex. 10), did TWTC indicate, in another letter dated June 25, 2002, (Rohback Aff., Ex. 11), that it would discontinue service as of July 13, 2002.

Additionally, N2G had already refused to pay the cost increase reflecting the European Differential for service from May to June 2002, an outstanding difference of $1,421,323.49, and it paid none of its bill totaling $951,951.79 for the service it received through July 12, 2002. (Davis February Aff., ¶¶ 19, 26; Invoice dated July 16, 2002; Statement Of Telephone Account dated July 1, 2002; Statement Of Telephone Account dated August 1, 2002; TWTC Rule 56.1 Statement ¶¶ 8, 9; N2G Response Rule 56.1 Statement, ¶¶ 8, 9.) In fact, TWTC has asserted claims for fraud and breach of contract against N2G as regards this nonpayment, and, in its letters dated June 14 and 25, 2002 to N2G (prior to its discontinuation of service on July 13, 2002), warned that it might do so.

---

11. For the reasons explained in Section II.B *supra,* the Court has determined that TWTC was acting within its contractual rights when it passed these expenses along to N2G.

TWTC's belief that N2G had breached its contractual obligations, evident in its June 2002 warnings to N2G and its subsequent filing of such claims, which the Court sustained for the reasons stated in Section II.E(1) *infra*, undermines the suggestion that its discontinuation of service reflects malice or intentional wrongdoing, as opposed to an attempt to mitigate damages in accordance with fundamental principles of contract law. *See, e.g., M. Golodetz Export Corp. v. S/S Lake Anja*, 751 F.2d 1103, 1112 (2d Cir.1985) ("The venerable rule that requires a plaintiff to mitigate his damages has been explained by the principle that 'damages which the plaintiff might have avoided with reasonable effort ... are ... not caused by the defendant's wrong ... and, therefore, are not to be charged against him.'" (quoting 2 Williston on Contracts § 1353, at 274 (1962))); *Drummond v. Morgan Stanley & Co., Inc.*, No. 95 Civ.2011, 1996 WL 631723, at *2 (S.D.N.Y. Oct.31, 1996) ("It is well settled that a plaintiff who suffers injury as the result of a breach of contract is under a duty to mitigate damages; if he or she fails to do so, any award of damages will be reduced by any unnecessary increase in damages due to the failure of the plaintiff to avoid them." (citations omitted; internal quotations omitted)).

Under these circumstances, in light of such nonpayment by N2G and of its option to accept charges reflecting the European Differential properly assessed pursuant to § 2.2.4, TWTC's decision to terminate service after one month rather than four cannot constitute the malice or intentional wrongdoing necessary to invalidate § 2.13.2 given the standard articulated and illustrated in the cases described above. Therefore, N2G's argument that the parties' contractual limitation of liability provision is invalid on this basis must be rejected as well.

### D. TWTC'S MOTIONS

#### 1. Breach of Contract and Specific Performance Claims

■ N2G seeks relief in the form of damages pursuant to its claim against TWTC for breach of contract, and seeks injunctive relief pursuant to its claim for specific performance. N2G asserts two bases for its claims: that TWTC's charge increase reflecting the European Differential was a rate increase in violation of the parties' agreements; and that TWTC did not, at all times, provide a so-called DS-3 cable or its equivalent to meet N2G's bandwidth demands.

With respect to TWTC's alleged improper increase of its international long distance rates, the Court has already concluded as a matter of law that the parties' contracts authorized the cost increase reflecting the European Differential. Any claim by N2G of breach of TWTC's obligations cannot, therefore, be sustained on this ground.

■ Furthermore, as regards both of N2G's proffered bases for breach of contract, because TWTC was acting within its contractual rights when it increased the charges to N2G to account for the European Differential and notified N2G on July 14, 2002 that it would do so, N2G's response to TWTC on June 17, 2002, in which N2G expressed its refusal to pay this added cost, amounted to a repudiation of the parties' contracts. Under New York law, TWTC was permitted to treat N2G's repudiation as a breach, thus excusing TWTC from further performance. *See, e.g., Silver Air v. Aeronautic Dev. Corp. Ltd.*, 656 F.Supp. 170, 178 (S.D.N.Y. 1987) ("When a promisor repudiates a contract, the injured party ... can treat the repudiation as an anticipatory breach...."); *De Forest Radio Tel. and Tel. Co. v. Triangle Radio Supply Co., Inc.*, 243 N.Y. 283, 153 N.E. 75, 78–79

(1926) ("When one party to a contract repudiates it and refuses to perform, the other party by reason of such repudiation is excused from further performance."); *Sidney Blumenthal & Co. v. S.M. Gallert & Co.*, 240 N.Y. 217, 148 N.E. 215, 216 (1925) ("The plaintiff could treat this refusal on the part of the defendant as an abandonment of the contract...").

▇▇▇ In this connection, when N2G refused to pay any of TWTC's invoices, even excluding the add-on charge for the European Differential, for service N2G received from June to July 2002, this nonpayment constituted a breach of its obligations to TWTC.[12] *See, e.g., Jafari v. Wally Findlay Galleries*, 741 F.Supp. 64, 67 (S.D.N.Y. 1990) ("The failure to tender payment is a material breach of a contract."); *Rahanian v. Ahdout*, 258 A.D.2d 156, 694 N.Y.S.2d 44, 48 (App. Div. 1st Dep't 1999) ("Plaintiff's remedy for defendants' alleged nonpayment would be to bring an action for breach of contract...."); *Hooker v. Wooten*, 237 A.D.2d 572, 655 N.Y.S.2d 995, 995 (App. Div. 2nd Dep't 1997) ("The plaintiff's failure to make monthly installment payments to the defendant pursuant to their agreement constituted a material breach of the agreement.").

▇▇▇ Having repudiated and breached its contracts with TWTC, N2G cannot now claim relief either in the form of specific performance or damages. *See, e.g., Jafari*, 741 F.Supp. at 68 ("Moreover, where a party materially breaches, he has failed to substantially perform the contract, and the other party is discharged from performing his obligation.") (citing *Merritt Hills Vineyards Inc. v. Windy Heights Vineyard, Inc.*, 61 N.Y.2d 106, 472 N.Y.S.2d 592, 460 N.E.2d 1077, 1081–82 (1984)); *Grace v. Nappa*, 46 N.Y.2d 560, 415 N.Y.S.2d 793, 389 N.E.2d 107, 110–111 (1979) ("Defendant's failure to provide the certificate was thus a material breach of the contract, excusing plaintiff's performance.... In sum, since defendant materially breached the contract for sale, he may not be awarded specific performance...."); *Hooker*, 655 N.Y.S.2d at 995 ("The plaintiff's failure to make monthly installment payments to the defendant pursuant to their agreement constituted a material breach of the agreement. Therefore, the plaintiff is not entitled to an award of specific performance."). This result applies as regards both bases proposed by N2G as grounds to assert a breach of contract and to seek damages and specific performance—namely, TWTC's termination of service, and the decline in quality of service and attendant reduction in the number of available DS–1 cables to carry N2G's traffic.[13]

---

**12.** The Court underscores at this point that these conclusions presume valid and binding contracts between the parties, in accordance with the parties' positions as regards the present motion. The Court's present analysis is limited to the construction of circumstances and allegations of wrongdoing presented by N2G, the nonmovant, as circumscribed by the evidence.

**13.** Regarding the latter ground, the service disruptions and reduction in the number of DS–1 cables available to carry N2G's traffic occurred following TWTC's migration of N2G's traffic from AT & T's network to that of MCI on June 4, 2002 and Broadwing on June 26, 2002. (Mikleton Dep. at 134.) To the

extent that any of these effects in quality of service occurred prior to N2G's June 17, 2002 repudiation and subsequent breach, they cannot serve as a basis for N2G's claims because N2G did not treat any such instances as a breach of its contracts with TWTC, as evidenced by N2G's making a payment to TWTC on June 25, 2002. (Davis February Aff., ¶ 19; Invoice dated July 16, 2002; Statement Of Telephone Account dated July 1, 2002; Statement of Telephone Account dated August 1, 2002; TWTC Rule 56.1 Statement ¶ 8; N2G Response Rule 56.1 Statement, ¶ 8.) Courts of New York and of this District and Circuit have long held that, under New York law, "the power to terminate a continuing contract because of a particular breach of that con-

Separately, for the reasons discussed in Section II.C *supra*, N2G has not made a showing of recoverable damages. Therefore, N2G's claims for specific performance and damages pursuant to its claim for breach of contract against TWTC must be dismissed on this independent basis as well. *See, e.g., Clamyer Int'l, Inc. v. Shurtape Tech., Inc.*, No. 98 Civ. 4510, 1999 WL 1225253, at *2 (S.D.N.Y. Dec.21, 1999) ("Plaintiff has failed to make out a prima facie case of breach of contract [because] ... he has not established, even if there was a breach, that any damages resulted."); *Soanes v. Empire Blue Cross/Blue Shield*, 970 F.Supp. 230, 242 (S.D.N.Y. 1997) (breach of contract claim dismissed on summary judgment "because [the insurer] cannot establish damages.").

For all of the foregoing reasons, N2G's claims for specific performance and for damages pursuant to breach of contract by TWTC, reflected in Counts I and II of the Amended Complaint And Jury Demand dated October 30, 2002 (the "Amended Complaint"), must be dismissed. This same reasoning also compels the Court to deny the portion of N2G's motion for partial summary judgment as to liability against TWTC pursuant to N2G's claim of breach of contract.[14]

### 2. *Communications Act*

▮▮▮▮▮ N2G asserts claims for relief pursuant to various provisions of the Communications Act, generally asserting that TWTC wrongfully increased the rates it charged N2G for international long distance calls; that it did so without providing 120 days notice of changes to published tariffs and practices; that it downgraded and ultimately refused to supply telecommunications service to N2G; and that it discriminated against N2G in charges for similar or like communications services.[15]

---

tract is a power of election.... Where a contract is broken in the course of performance, the injured party has a choice presented to him of continuing the contract or of refusing to go on. If the injured party chooses to go on, he loses his right to terminate the contract because of the default." *Apex Pool Equip. Co. v. Lee*, 419 F.2d 556, 562 (2d Cir.1969) (citations omitted; internal quotations omitted); *see ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F.Supp.2d 383, 387–88 (S.D.N.Y.1999) (same, adding: "Once a party elects to continue the contract, [it] can never thereafter elect to terminate the contract based on that breach, although [it] retains the option of terminating the contract based on other, subsequent breaches.") (citations omitted; internal quotations omitted) (quoting *Bigda v. Fischbach Corp.*, 898 F.Supp. 1004, 1011–12 (S.D.N.Y.1995)); *Silver Air*, 656 F.Supp. at 178 (same, adding: "However, a contract that is not treated as broken continues to exist for the benefit of *both* parties. There is no specific time limit within which the non-repudiating party must elect his remedy, but if the non-repudiating party himself defaults on the contract before he elects to accept the breach, the other party has the right to act upon his default." (emphasis in original)); *Emigrant Indus. Sav.*

Bank v. Willow Builders, Inc.*, 290 N.Y. 133, 48 N.E.2d 293, 299 (1943) ("Where a contact is broken in the course of performance, the injured party has a choice presented to him of continuing the contract or of refusing to go on.... If the injured party chooses to go on, he loses his right to terminate the contract because of the default." (citations omitted; internal quotations omitted)); *Inter–Power of New York, Inc.*, 686 N.Y.S.2d at 913–14 (same, adding: "The adverse party must, however, make an election and cannot 'at the same time treat the contract as broken and as subsisting. One course of action excludes the other.'") (quoting *Strasbourger v. Leerburger*, 233 N.Y. 55, 134 N.E. 834, 835 (1922)).

**14.** *See* Section II.E(1) *infra*.

**15.** N2G's right to assert claims under the Communications Act originates in §§ 206 and 207, which "are broadly written and explicitly encompass all of the substantive provisions of the Communications Act, While a particular substantive provision may not provide the plaintiff with a particular right, if the violation of that provision injures the plaintiff, sections 206 and 207 of the Communications Act confer upon the plaintiff the right to bring an action to recover for its injuries." *Law*

N2G also moves for summary judgment pursuant to claims it asserts under § 202(a) regarding discriminatory charges and under § 203(b)(1) regarding changes in schedules and modifications of agreements. TWTC moves to dismiss all of N2G's claims under the Communications Act.

For the reasons discussed in Section II.B *supra*, the Court has already concluded that TWTC's passing along to N2G costs reflecting the European Differential, resulting in higher overall charges to N2G for calls terminating to cellular telephones, was permitted by § 2.2.4 of TWTC's published Tariff. Accordingly, not only does this extra cost not amount to a "rate" increase, again, for the reasons previously discussed, but, irrespective of the nomenclature (e.g., "rate," "surcharge," etc.), it also does not represent any "change" to TWTC's preexisting published tariff provision, specifically, § 2.2.4, which authorized the charge, thus rendering the Communications Act's 120 days notice requirement inapplicable. *See* 47 U.S.C. § 203(b)(1) ("No *change* shall be made in the charges, classifications, regulations, or practices which have been so filed and published except after one hundred and twenty days notice to the Commission and to the public, which shall be published in such form and contain such information as the Commission may by regulations prescribe." (emphasis added)).

With respect to N2G's challenge concerning quality and termination of service, presumably asserted pursuant to § 251 of the Communications Act, while § 251 requires interconnectivity among telecommunications carriers and service parity in various forms, it is undisputed that TWTC did agree to interconnect with and provide service to N2G, as evident in the execution of the March LSA and May LSA. Once an interconnectivity agreement such as those between the parties in the present dispute is formed and approved by government regulators, "the [C]ommunications Act intends that the [local exchange carrier] be governed directly by the specific agreement rather than the general duties described in ... section 251." *Law Offices of Curtis V. Trinko, L.L.P. v. Bell Atlantic Corp.*, 305 F.3d 89, 103 (2nd Cir. 2002); *see Michigan Bell Tel. Co. v. MCIMetro Access Trans. Servs., Inc.*, 323 F.3d 348, 359 (6th Cir.2003) (The provisions of § 251 "require an incumbent to negotiate agreements and provide interconnection, but once an agreement is approved, these general duties do not control, lest carriers have diminished incentive to enter interconnection agreements.").

In this case, TWTC agreed to provide service to N2G, as evident in its assent to both the March LSA and May LSA. It was the subsequent implementation of the parties' obligations, particularly concerning payment and the nature and extent of

---

*Offices of Curtis V. Trinko, L.L.P. v. Bell Atlantic Corp.*, 305 F.3d 89, 98 (2d Cir.2002). N2G's Amended Complaint, however, sets forth N2G's understanding of the legal requirements of §§ 201(a), 202(a), 203, 206, 217, and 251 of the Communications Act but does not clearly delineate the factual basis for any causes of action that may or may not be encapsulated by these sections, relying instead on separate references to factual allegations that "constituted a violation of the provisions of the Federal Communications Act." (Amended Complaint, ¶¶ 237–251.) Accord-

ingly, and setting aside any potential conflict here presented with the pleading requirements of Fed.R.Civ.P. 8, the Court's discussion of N2G's present cause of action will likewise address the factual underpinnings of the parties' dispute as best as the Court can construe them to be articulating a viable claim. In the process, the Court will consider relevant discussions in N2G's memoranda of law submitted in regards to the motions presently before the Court, which propound allegations of violations of §§ 202(a) and 203(b)(1) of the Communications Act.

service requirements, that led to the ultimate termination of service. As previously discussed in sections II.B and II.D(1) *supra,* not only did Tariff § 2.2.4, by its plain language, authorize TWTC to take steps to mitigate the economic impact of the European Differential—including the migration of N2G's traffic from AT & T's network to then-less expensive routes owned by MCI and Broadwing as well as the termination of service altogether, (*see* Tariff § 2.2.4. ("The Company reserves the right to *discontinue service, limit service,* or to *impose requirements* as required . . . .") (emphasis added))—but N2G's June 17, 2002 repudiation and subsequent breach of the parties' contracts in fact discharged TWTC from its contractual obligations to continue service. Either way, neither TWTC's migration of N2G's traffic (and its collateral service limitations) nor its ultimate termination of service altogether can properly be construed as a denial of service in violation of the Communications Act.

 Nor can N2G's claim of discriminatory pricing in violation of § 202(a) of the Communications Act be sustained on this record. Section 202(a) provides:

It shall be unlawful for any common carrier to make any *unjust or unreasonable* discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

(emphasis added). Elaborating on this provision, the Second Circuit has stated that "[a]n inquiry into whether a carrier is discriminating in violation of § 202(a) involves a three-step inquiry: (1) whether the services are 'like'; (2) if they are, whether there is a price difference between them; and (3) if there is, whether that difference is reasonable." *Curtis V. Trinko,* 305 F.3d at 98–99 (quoting *Competitive Telecomm. Ass'n v. FCC,* 998 F.2d 1058, 1061 (D.C.Cir.1993)). The purpose of this section "was to eliminate the use of monopolistic power to stifle competition." *Id.; National Communications Ass'n, Inc. v. AT & T Corp.,* 238 F.3d 124, 127 (2d Cir.2001) (citations omitted).

As previously noted, TWTC is a domestic carrier owning no international cables or routes of its own. Less than one-half of one percent of its carriage was composed of international long distance traffic, excluding demand from N2G, and, given this limited international presence, TWTC subcontracted with AT & T, MCI, and Broadwing for international service to its customers. In May, June, and July 2002, just as the parties' contracts began to be implemented, AT & T, MCI, and Broadwing, respectively, started assessing higher charges for calls terminating to cellular telephones in Europe as permitted by the European Differential. In this way, the circumstances were in transition. On September 10, 2002 and December 13, 2002, TWTC adjusted its pricing schedules for of all its customers to reflect this differential.

It is true that N2G's charges were adjusted to account for the European Differential before those of TWTC's other customers were, but because of the high volume of traffic terminating to cellular telephones in Europe directed to TWTC by N2G—as indicated, for example, over $1.7 million worth in the first month of service alone despite projected minimum requirements of $1 million per year—and because TWTC's service to N2G commenced contemporaneously with the time TWTC's subcontractors' increased their charges to reflect the European Differen-

tial, TWTC's business decision to address the emerging developments in pricing by beginning with its single biggest source of international long distance traffic cannot be deemed unreasonable. *See, e.g., Buy This, Inc. v. MCI Worldcom Communications, Inc.,* No. 01 Civ. 8829, 2002 WL 31011876, at \*2 (S.D.N.Y. Sept.6, 2002) (on motion to reconsider grant of summary judgment in MCI's favor, court concluded: "MCI's decision to deny its 'six month free' promotion to [telecommunications] resellers was not an 'unreasonable' discrimination, because ... doing so would permit a reseller to capture profits properly belonging to MCI."); *Allen v. American Tel. & Tel. Co.,* Nos. 89 Civ. 5087, 89 Civ. 6399, 1990 WL 515050, at \*4 (S.D.N.Y. July 16, 1990) (granting summary judgment in favor of AT & T, the court observed: "AT & T's experience reveals that the degree of telephone toll fraud at correctional facilities is significant enough to warrant the adoption of specific controls designed to avoid fraud, protect company revenues, and protect AT & T customers from incurring unwanted charges. Thus, AT & T's [caller] announcement practice in regard to inmate collect calls reasonably furthers a legitimate objective consistent with § 202 of the Act."). Nor can TWTC's doing so be deemed unjust given that the parties' contracts, namely, § 2.2.4, specifically permitted TWTC, as the Court has ruled, to pass along this additional expense to N2G. Furthermore, given TWTC's subsequent amendments to its pricing scheme as regards all of its customers, the price difference experienced by N2G as the first customer to have to pay these additional charges, assuming the parties' contracts had not been terminated, would have been only temporary and in response to the transitory circumstances.

Additionally, for the reasons discussed in Section II.C *supra,* N2G has not established that it is entitled to any recoverable damages. This finding presents an independent basis to deny N2G's relief under the Communications Act. *See Conboy v. AT & T Corp.,* 241 F.3d 242, 250–51 (2d Cir.2001) ("Accordingly, a private party seeking relief under Sections 206 and 207 of the Communications Act must allege and prove specific damages flowing from violations of the Act, and cannot recover presumed damages." (citation omitted; internal quotations omitted)).

The premises and factual underpinnings of each of N2G's arguments under the Communications Act have been addressed in greater detail in the Court's earlier discussions concerning the parties' motions. For all of these reasons, N2G on this record has made no showing that it is entitled to relief under the Communications Act. Accordingly, Count IV of the Amended Complaint must be dismissed, and N2G's motion for partial summary judgment as to liability against TWTC pursuant to this claim must be denied.

### 3. Tortious Interference

■ N2G also asserts that TWTC tortiously interfered with N2G's telecommunications service contracts with its own customers when TWTC migrated N2G's traffic from AT & T's network onto routes operated by MCI and Broadwing, thereby allegedly impairing the quality of service it received, and when TWTC ultimately discontinued service to N2G altogether. TWTC disputes this claim on various grounds, arguing that N2G has failed to establish the necessary elements of a claim of tortious interference with contractual relations under New York law and asserting an economic justification defense.

■ Under New York law, a claim of tortious interference with contractual relations requires a four-part showing: (1) the existence of a valid contract between the plaintiff and a third party; (2) the

defendant's knowledge of that contract; (3) the defendant's intentional procuring of a breach of that contract; and (4) damages resulting from the breach. *See Health–Chem Corp. v. Baker,* 915 F.2d 805, 809 (2d Cir.1990); *MDC Corp., Inc. v. John H. Harland Co.,* 228 F.Supp.2d 387, 397 (S.D.N.Y.2002); *Foster v. Churchill,* 87 N.Y.2d 744, 642 N.Y.S.2d 583, 665 N.E.2d 153, 156 (1996). However, where the defendant has an economic interest in such a contract between the plaintiff and a third party, the plaintiff must also make a showing of malice or fraudulent or illegal means. *See Health–Chem Corp.,* 915 F.2d at 809 ("[T]o be actionable, the interference must be intentional and not incidental to some other lawful purpose."); *MDC Corp., Inc.,* 228 F.Supp.2d at 397 ("Where the defendants have an economic interest in the contract . . . liability will be imposed only where plaintiff can make a showing of malice on the one hand or fraudulent or illegal means on the other."); *Jenkins v. Tyler,* 167 F.Supp.2d 652, 657 (S.D.N.Y. 2001) ("In addition, under New York law, procuring the breach of a contract in the exercise of equal or superior right is acting with just cause or excuse, and is a defense to an action for tortious interference with contract." (citations omitted; internal quotations omitted)); *Foster,* 642 N.Y.S.2d 583, 665 N.E.2d at 157 ("The imposition of liability in spite of a defense of economic interest requires a showing of either malice on the one hand, or fraudulent or illegal means on the other.").

TWTC is a domestic telecommunications carrier owning no international cables or routes of its own and providing a minimal amount of international long distance service to its customers by subcontracting for such supplemental service with international carriers. The Court has already explained in detail its reasoning, given these circumstances, concerning the economic feasibility of TWTC's discontinuation of service to N2G in light of the unexpected volume of international long distance calls terminating to cellular telephones generated by N2G and in light of the developments in pricing by TWTC's international carriers reflecting the European Differential. During the first month of service alone, for example, while TWTC incurred expenses of approximately $1.7 million from calls originating through N2G, N2G's total payments for this service amounted only to $300,000, thereby yielding an economic loss to TWTC of over $1.4 million. By the next month, TWTC had incurred additional expenses totaling $951,951.79, again, all for calls terminating to cellular telephones in Europe.[16] In total, then, from May 10, 2002 when TWTC commenced service to N2G, through July 12, 2002, after which service was terminated, TWTC incurred an economic loss of over $2.4 million on this account.[17] In contrast, the total revenue N2G received from its contracts with its own customers during the corresponding time period was $1,095,548.33. (Plaintiff's Responses To The Defendants' Interrogatories dated October 14, 2002, ¶ 4 (*reprinted as* Ex. 15 to

**16.** N2G made no payments during this latter period, apparently given the developing disagreement between the parties regarding pricing and the volume and type of international long distance service demand.

**17.** N2G does not dispute the economic import of these circumstances as regards TWTC and, indeed, attempts to argue that TWTC had an obligation to continue to provide service

nonetheless. (*See* Memorandum Of Law In Reply To Defendants' Opposition To And In Further Support of Plaintiff's Motion For Summary Judgment dated March 24, 2003, at 12 ("Moreover, TWTC's claim of economic justification does not shield it from liability. It is well-settled that the furthering of one's business interests does not justify causing the breach of a contract for a definite term.").)

Rohback Aff.).) TWTC's economic interest is thus clear.

The Court has already discussed at length its reasons for rejecting N2G's assertion of malice in the context of N2G's challenge to the validity of the parties' contractual limitation of liability provision, § 2.13.2. *See* Section II.C(2) *supra.* Those same arguments, effectively recast in the context of N2G's tortious interference claim, must again be rejected for the same reasons. Furthermore, for the reasons discussed in Section II.B *supra,* the Court has already concluded that the parties' contracts, specifically, § 2.2.4, permitted TWTC to adjust service, impose additional costs, and even terminate service in response to developing regulatory demands or economic unfeasibility. The Court has also concluded, for the reasons explained in Section II.D(1) *supra,* that N2G's June 17, 2002 letter to TWTC rejecting TWTC's pass through of expenses reflecting the European Differential, effectively repudiated the parties' contracts, and its subsequent nonpayment constituted a breach, both discharging TWTC from its remaining contractual obligations. Having a proper basis in the parties' contract and in applicable contract law in these ways, TWTC's actions cannot properly be characterized as fraudulent or illegal. For all of these reasons, the Court concludes that any interference with N2G's contracts was economically justified, requiring N2G's claim of tortious interference with contractual relations to be dismissed.

Additionally, as indicated, to maintain a claim for tortious interference with contractual relations, a plaintiff must establish damages. *See Health–Chem Corp.,* 915 F.2d at 809; *MDC Corp., Inc.,* 228 F.Supp.2d at 397; *Foster,* 642 N.Y.S.2d 583, 665 N.E.2d at 156. For the reasons explained in Section II.C *supra,* N2G has not made a showing that it is entitled to recoverable damages. This deficiency presents an independent basis that compels dismissal of N2G's claim for tortious interference with contractual relations against TWTC. Accordingly, TWTC's motion for summary judgment dismissing N2G's claim of tortious interference with contractual relations asserted in Count VI of the Amended Complaint must be granted, and N2G's motion for partial summary judgment as to liability on this claim must be denied.

## E. *N2G'S MOTION*

### 1. *Summary Judgment*

N2G's arguments in support of its motion for partial summary judgment as to liability pursuant to its claims against TWTC for breach of contract set forth in Count II of the Amended Complaint, for violation of the provisions of the Communications Act set forth in Count IV of the Amended Complaint, and for tortious interference with contractual relations set forth in Count VI of the Amended Complaint have already been rejected in the course of the Court's discussion of TWTC's motion for summary judgment dismissing these claims given the conceptual overlap of the parties' respective motions. Accordingly, no further discussion is necessary, and N2G's motion as to these claims is denied.

N2G also moves for summary judgment dismissing TWTC's First and Second Counterclaims set forth in its Answer And Counterclaim Of Defendants Time Warner Telecom Of New York, L.P., Time Warner Telecom Holdings, Inc., And Time Warner Telecom General Partnership To Plaintiff's Amended Complaint And Jury Demand dated December 18, 2002 (the "Answer"). These counterclaims assert, respectively, breach of contract for N2G's alleged failure to make certain weekly payments for service rendered and for N2G's alleged

failure to pay charges assessed pursuant to the European Differential.

With respect to the latter counterclaim, N2G argues that TWTC has no basis to allege a breach in the form of N2G's failure to pay charges reflecting the European Differential because these costs are not contractually authorized charges but, rather, rate increases in violation of the provisions in the March LSA and May LSA guaranteeing that rates as specified will not rise during the course of the agreements. (*See* N2G February 14 B.R. at 21–24.) For the reasons stated in Section II.B *supra*, the Court has already concluded that the parties' contracts did authorize TWTC to pass along these additional expenses to N2G and that this pass through of expenses is not properly construed as a rate increase. Therefore, N2G's argument that its nonpayment of these expenses did not violate the parties' agreements and, in turn, cannot form the basis for a claim of breach of contract, must be rejected.

N2G also argues that TWTC cannot assert breach of contract on either basis because TWTC itself repudiated the parties' contracts when: (1) TWTC raised its rates in response to the European Differential; and (2) when TWTC ultimately terminated service to N2G. (*See* N2G February 14 B.R. at 24.) Again, for the reasons set forth in Section II.B *supra*, TWTC's decision to pass along its added expenses reflecting the European Differential is not properly characterized as a rate increase and, indeed, was authorized by the parties' contracts. Furthermore, as set forth in Sections II.B and II.D(1) *supra*, assuming valid contracts and binding obligations, it was N2G that: (1) repudiated the parties' agreements in its letter of June 17, 2002, in which N2G refused to accept the increased charges, and (2) breached the parties' agreements when it failed to make these, and, indeed, any payments for services rendered thereafter. Therefore, nei-

ther of these bases can properly be construed as a repudiation by TWTC of the parties' contracts. Accordingly, N2G's motion to dismiss TWTC's claims of breach of contract on this ground must be denied.

### 2. *Failure to State a Claim Upon Which Relief Can Be Granted*

N2G also argues that TWTC's Third, Fourth, and Fifth Counterclaims for fraud, unjust enrichment, and breach of the covenant of good faith and fair dealing, respectively, must be dismissed, pursuant to Fed. R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted. When presented with such a motion, the Court accepts all well pleaded factual assertions in the Answer as true and draws all reasonable inferences in favor of the defendant. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *McGinty v. State of New York*, 193 F.3d 64, 68 (2d Cir.1999). Additionally, "the court will not dismiss the case unless it is satisfied that the [Answer] cannot state any set of facts that would entitle [the defendant] to relief." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir.2001); *Harris v. City of New York*, 186 F.3d 243, 246 (2d Cir.1999). In the course of its review, the Court may refer "to documents attached to the [Answer] as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in [defendant's] possession or of which [the defendant] had knowledge and relied on in bringing suit." *Brass v. American Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *see Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000).

TWTC alleges in the Answer various bases to assert a claim of fraud, including (but not limited to) the following—that N2G: (1) misrepresented its financial con-

dition; (2) misrepresented existing and likely future clients; (3) misrepresented the nature of its service demands, namely, that all of the calls routed through TWTC's network would terminate to cellular telephones in Europe; and (4) deliberately failed to disclose superior knowledge concerning the European Differential. (Answer, ¶¶ 312, 315–17, 311, 362–389.) N2G argues that any alleged misrepresentations asserted by TWTC were immaterial, were not relied upon by TWTC, and did not result in any damage to TWTC because §§ 201, 202, and 251 of the Communications Act required TWTC to provide service to any telecommunications provider, including a telecommunications reseller, in accordance with TWTC's publish rates and tariffs.

▪▪▪ The Court rejects N2G's argument. The Communications Act requires telecommunications carriers to interconnect with and provide service to other providers, but this requirement is not categorical, nor are the details of service predetermined by the statute. A carrier may decline a request for service where the request is unreasonable. *See* Communications Act § 201(a) ("It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service *upon reasonable request* therefor." (emphasis added)); *National Communications Ass'n, Inc. v. American Tel. & Tel. Co.*, No. 92 Civ. 1735, 1998 WL 118174, at *13, *15 (S.D.N.Y. Mar. 16, 1998) ("Here, the question of whether AT & T violated section 201(a), and of whether NCA's request was 'reasonable' within the meaning of the statute, turns upon resolving the parties' conflicting interpretations of [specified] eligibility requirements."). A carrier may also define the parameters of service and payment at a level of detail beyond that presented by the Communications Act. *See Curtis V. Trinko*, 305 F.3d at 103 (noting that once an interconnectivity

agreement is formed and approved by government regulators, "the [C]ommunications Act intends that the [local exchange carrier] be governed directly by the specific agreement rather than the general duties described in . . . section 251."); *see Mich. Bell Tel. Co.*, 323 F.3d at 359 (noting that the provisions of § 251 "require an incumbent to negotiate agreements and provide interconnection, but once an agreement is approved, these general duties do not control, lest carriers have diminished incentive to enter interconnection agreements.").

▪▪▪ Considered against this backdrop, the alleged misrepresentations identified by TWTC as bases for its claim of fraud can be found by a rational trier of fact to implicate such supplemental obligations and details beyond the interconnectivity and service requirements dictated by the Communications Act. For example, the alleged misrepresentations about N2G's financial condition and its existing and anticipated clients implicate matters such as the timing of payment and anticipated need for a security deposit. Alleged misrepresentations about N2G's clients and service demands—namely, the alleged failure to disclose that all calls would terminate internationally—implicate matters such as the number and kinds of cables that TWTC would need to devote to N2G's bandwidth requirements. TWTC's allegations of N2G's superior knowledge regarding the European Differential together with alleged misrepresentations about its calls terminating to cellular telephones in Europe might well have led TWTC to investigate and uncover the European Differential in advance of forming the March and May LSAs and, as a result, enabled TWTC to specifically delineate those expenses at the outset, rather than rely on § 2.2.4 during the implementation of the contracts after incurring several weeks of

this unexpected expense. (Answer, ¶¶ 371, 380–83, 387–89.) The matters implicated by these alleged misrepresentations concern details that lie beyond the interconnectivity and service dictates of the Communications Act, yet implicate matters within the scope of the parties' contractual relationship. (*See* March LSA, May LSA.) Therefore, N2G's argument that the Communications Act's interconnectivity and service requirements preclude a finding of fraud as a matter of law must be rejected.

N2G also moves to dismiss TWTC's counterclaim for unjust enrichment, arguing that a claim of unjust enrichment is precluded where there exists a valid contract between the parties. The validity of the parties' contracts is a matter in dispute, however, as reflected in TWTC's Third Counterclaim asserting fraudulent inducement. (Answer, ¶¶ 362–89; *id.,* ¶ 388 ("TWTC would not have entered into these agreements with Net2Globe if TWTC had known the true facts.").) The dispute over the validity of these contracts permits TWTC to assert unjust enrichment as an alternative to breach of contract, and unlike this latter claim, a claim of unjust enrichment may serve as a basis for recovery should a trier of fact determine that, in fact, no valid contract was formed or that the contractual obligations did not encompass the events underlying the asserted basis for TWTC's unjust enrichment claim. *See, e.g., Schwartz v. Asplundh Tree Expert Co., Inc.,* 102 F.3d 660, 663 (2d Cir.1996) ("Counts One and Three for quantum meruit and unjust enrichment were quite properly subsumed by the district court into a single count for restitution, ... and were properly pleaded as such in the alternative to the contractual claim of Count One ...." (citations omitted)); *Bridgeway Corp. v. Citibank, N.A.,* 132 F.Supp.2d 297, 305 (S.D.N.Y.2001) ("Generally, quasi-contractual relief, such as unjust enrichment, is not permitted when an express agree-

ment exists that governs the dispute between the parties.... Because there is a dispute as to defendant's obligations under the contract, however, plaintiff's unjust enrichment claim survives, although solely as an alternative to the breach of contract claim." (citations omitted)); *Ox v. The Union Cent. Life Ins. Co.,* No. 94 Civ. 4754, 1995 WL 634991, at *6 (S.D.N.Y. Oct.27, 1995) ("[A]s long as a factual issue remains as to the fraud claim, recovery under a theory of unjust enrichment may be proper, even in the presence of an alternative breach of contract claim."). Therefore, N2G's motion to dismiss TWTC's Fourth Counterclaim asserting unjust enrichment must be dismissed, and this counterclaim survives as an alternative to TWTC's First and Second Counterclaims for breach of contract.

Finally, N2G argues that TWTC's Fifth Counterclaim, alleging a breach of the covenant of good faith and fair dealing, sets forth the same allegedly wrongful activity as TWTC's Second Counterclaim for breach of contract and is therefore precluded under New York law. TWTC disagrees, arguing that the activity underlying its claim of breach of the covenant of good faith and fair dealing is broader than the activity it asserts as the basis for its Second Counterclaim for breach of contract.

Under New York law, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educational Testing Serv.,* 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291–92 (1995). The Second Circuit has counseled, with respect to this doctrine, that "[t]he boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." *Cross & Cross Props., Ltd. v. Everett Allied Co.,* 886 F.2d 497, 502 (2d Cir.1989). The covenant does not exist in

the absence of an underlying contract and is intended to serve "in aid and furtherance of other terms of the agreement of the parties." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, 91 (1983); *see Alter v. Bogoricin*, No. 97 Civ. 0662, 1997 WL 691332, at *7 (S.D.N.Y.1997) ("[T]he covenant of good faith and fair dealing is not distinct from the underlying contract. . . .").

As this Court has previously ruled, a claim for breach of the covenant may be maintained "only if it is based on allegations different than those underlying the accompanying breach of contract claim." *TVT Records v. The Island Def Jam Music Group*, 244 F.Supp.2d 263, 277–78 (S.D.N.Y.2003) (quoting *Siradas v. Chase Lincoln First Bank, N.A.*, No. 98 Civ. 4028, 1999 WL 787658, at *6 (S.D.N.Y. Sept. 30, 1999)). The covenant protects a promisee not against a breach of the express terms of a contract but of the reasonable expectations and inferences otherwise derived from the agreement. *See Sauer v. Xerox Corp.*, 95 F.Supp.2d 125, 132 (S.D.N.Y.2000) ("[S]uch a claim may be brought . . . only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain."); *EUA Cogenex Corp. v. North Rockland Cent. Sch. Dist.*, 124 F.Supp.2d 861, 873 (S.D.N.Y.2000); *Alter*, 1997 WL 691332, at *7.

The language set forth in the portion of the Answer asserting a breach of the covenant of good faith and fair dealing, namely, ¶¶ 393–96, identifies as TWTC's asserted basis for this claim N2G's nonpayment of costs resulting from the European Differential. This same activity constitutes the basis for TWTC's Second Counterclaim asserting breach of contract. (Answer, ¶¶ 350–53.) In Defendants' Memorandum Of Law In Opposition To Plaintiff And Counterclaim–Defendant's Motion For Summary Judgment And To Dismiss Counterclaims dated March 12, 2003 at 17–18, TWTC identifies an apparent alternative basis for asserting a breach of the covenant of good faith and fair dealing, namely, N2G's failure to continue making payments on a weekly basis. Even if this alternative proposal were apparent from the language of the relevant portions of the Answer setting forth TWTC's Fifth Counterclaim, however, that same allegation of untimely payment constitutes the basis for TWTC's First Counterclaim for breach of contract. (Answer, ¶¶ 354–61.) Therefore, because the grounds underlying TWTC's Fifth Counterclaim for breach of the covenant of good faith and fair dealing also constitute TWTC's asserted bases for its First and Second Counterclaims for breach of contract, N2G's motion to dismiss TWTC's Fifth Counterclaim for breach of the covenant of good faith and fair dealing is granted.

### III. *CONCLUSION AND ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the motion pursuant to Fed.R.Civ.P. 56 by defendants Time Warner Telecom of New York, L.P., Time Warner Telecom Holdings, Inc., and Time Warner Telecom General Partnership to dismiss Counts I, II, IV, and VI of the Amended Complaint And Jury Demand dated October 30, 2002 filed by plaintiff Net2Globe International, Inc. is GRANTED; and it is further

**ORDERED** that the portion of plaintiff Net2Globe International, Inc.'s motion pursuant to Fed.R.Civ.P. 56 for partial summary judgment in its favor on Counts II, IV, and VI of its Amended Complaint And Jury Demand dated October 30, 2002 is DENIED; and it is further

**ORDERED** that the portion of plaintiff Net2Globe International, Inc.'s motion

pursuant to Fed.R.Civ.P. 56 to dismiss the First and Second Counterclaims set forth in the Answer And Counterclaim Of Defendants Time Warner Telecom Of New York, L.P., Time Warner Telecom Holdings, Inc., And Time Warner Telecom General Partnership To Plaintiff's Amended Complaint And Jury Demand dated December 18, 2002 is DENIED; and it is further

**ORDERED** that the portion of plaintiff Net2Globe International, Inc.'s motion pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the Third and Fourth Counterclaims set forth in the Answer And Counterclaim Of Defendants Time Warner Telecom Of New York, L.P., Time Warner Telecom Holdings, Inc., And Time Warner Telecom General Partnership To Plaintiff's Amended Complaint And Jury Demand dated December 18, 2002 for failure to state a claim upon which relief can be granted is DENIED; and it is further

**ORDERED** that the portion of plaintiff Net2Globe International, Inc.'s motion pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the Fifth Counterclaim set forth in the Answer And Counterclaim Of Defendants Time Warner Telecom Of New York, L.P., Time Warner Telecom Holdings, Inc., And Time Warner Telecom General Partnership To Plaintiff's Amended Complaint And Jury Demand dated December 18, 2002 for failure to state a claim upon which relief can be granted is GRANTED; and it is finally

**ORDERED** that the parties are directed to appear at a conference with the Court on August 1, 2003 at 3:00 p.m. to discuss scheduling and preparation of materials for trial of the issues remaining in this matter.

**SO ORDERED.**